IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| GUNVOR SA,<br><br>Plaintiff,<br><br>v.<br><br>ARMAN KAYABLIAN, LAWRENCE KAYABLIAN, and AMIRA GROUP COMPANY, LLC,<br><br>Defendants. | Civil Action No: 1:18-cv-00934 |

## VERIFIED COMPLAINT

Plaintiff GUNVOR SA ("Gunvor"), by its attorneys with Blank Rome LLP, files this Verified Complaint against Defendants ARMAN KAYABLIAN ("Arman"), LAWRENCE KAYABLIAN ("Lawrence"), and AMIRA GROUP COMPANY, LLC ("Amira") (collectively "Defendants"), to recover damages suffered as a result of Defendants' fraudulent conduct in connection with purported fuel oil contracts.

## INTRODUCTION

1.      Gunvor is a global commodities trading house that, among other things, sources and physically trades crude oil and refined oil products from countries around the world.  In or around March 2016, Defendants approached Gunvor to propose a joint venture ("JV") deal involving the purchase and transport of fuel oil from Iraq.  Unbeknownst to Gunvor, Defendants' proposal was, in fact, a scheme to defraud Gunvor.

2.      As alleged in detail below, Defendants made numerous and repeated misrepresentations to Gunvor and provided Gunvor with fake documents that led Gunvor to agree to the transaction; yet, Defendants ultimately converted Gunvor's funds and failed to deliver the

volume of fuel promised, in turn causing Gunvor to suffer substantial losses of not less than $30,000,000.

3.     Another central element of Defendants' scheme was the use of an agent from a non-party investment bank with which Gunvor was familiar.  Defendants used this agent to make contact and communicate with Gunvor.  And, the fact that the bank was backing Defendants influenced Gunvor in clearing its initial due diligence against Defendant Amira because the bank is incorporated in England and Wales, and Gunvor understood that it, therefore, subjects trading companies to stricter scrutiny than banks incorporated in other European countries.

4.     At the time Defendants proposed the fuel oil deal to Gunvor, it was known in the industry that, provided the quantities and pricing discount were right, securing any form of concession to lift fuel oil from Iraq could be profitable.

5.     In addition, although it is preferable to utilize a formal JV for projects such as the one Defendants proposed, Defendants represented to Gunvor that there was an urgent need to lift fuel oil and insufficient time to finalize a JV, which can take 6-8 months.  Indeed, Defendants told Gunvor that there were trucks full of fuel oil at an Iraqi port waiting to load vessels.

6.     This purported urgency, plus the backing from the investment bank, led Gunvor to agree to a more flexible arrangement than it normally would demand.

7.     It was with this urgency that Gunvor looked to a more flexible arrangement in the short term.  In sum, Gunvor agreed to enter into a series of one-off contracts that mimicked the structure of a JV without the formality and to prepay certain amounts that were to be transferred to the bank account of a state-owned oil company as security for lifting the fuel oil.  Yet, as shown below, Defendants misled Gunvor – they provided inaccurate information regarding the bank account, diverted funds directly to themselves, failed to deliver the amount of oil promised, lied

2

about where the money went once Gunvor suspected it had been defrauded, and refused to make Gunvor whole for its losses.

## PARTIES

8.     Plaintiff Gunvor SA is a Swiss corporate business entity known as a Société Anonyme. Its principal place of business is Rue Du Rhône 80-84 Genève, Genève, 1204 Switzerland.

9.     Defendant Lawrence Kayablian is a U.S. citizen who resides at 4009 N. Richmond St. Arlington, VA 22207. Upon information and belief, Lawrence is the Chief Executive Officer of the corporate group of companies known as the "Amira Group," including Defendant Amira Group Company, LLC ("Amira") and non-party Nemsss Petroleum Ltd of BVI ("Nemsss"), and the Chief Executive Officer and director of Nemsss.  At all relevant times, Lawrence used an Amira company email address (lk@amiraindustries.ch) when corresponding with Gunvor.

10.     Defendant Arman Kayablian is a U.S. citizen who resides at 4007 N. Richmond St. Arlington, VA 22207. Upon information and belief, Arman is an owner, officer and/or director of the "Amira Group."   At all relevant times, Arman used Amira company email address (ak@amiraindustries.ch) when corresponding with Gunvor.

11.     Upon information and belief, Defendant Amira is Virginia limited liability company with its principal place of business and registered agent located at 10527 Providence Way, Fairfax VA 22030.  Public records also indicate Amira uses 4009 N. Richmond St. Arlington, VA 22207 as its company address, which is the same address listed for Lawrence's residence.

## NON-PARTIES

12.     Non-party Nemsss was a British Virgin Islands company with registration number 1893585 and registered address Vanterpool Plaza, 2nd floor, Wickhams Cay 1, Road Town,

3

Tortola, British Virgin Islands. The Certificate of Incumbency dated March 17, 2016 lists (1) Nader Eissa A Almously; (2) Arman Mark Kayablian; and (3) Lawrence Khatchi Kayablian as directors of Nemsss. Upon information and belief, Nemsss is a single-purpose entity owned in whole or in significant part by Defendants Lawrence and Arman, and was created solely as an instrument to perpetrate a fraud on Gunvor. Nemsss ceased doing business shortly after Gunvor discovered the fraud.[1]

13.     Upon information and belief, non-party Iraqi Oil Tankers Corporation ("IOTC") is a state-owned Iraqi company specializing in the ocean transport of crude oil and refined products.

14.     Upon information and belief, non-party Gulf Energy for Petroleum Services ("GEPS") is the Iraqi-registered subsidiary company of non-party Nemsss.  Upon information and belief, Defendants used GEPS primarily as an instrument to perpetrate a fraud on Gunvor

15.     Non-party Hannam & Partners ("H&P") is an investment bank that acts as a financial adviser and corporate broker for companies. H&P's principal place of business is 2 Park St, Mayfair, London W1K 2HX, UK.  Upon information and belief, at all relevant times, H&P provided financial and brokerage services to Defendants Lawrence and Arman, and the companies in the Amira Group.

16.     At all relevant times, non-party Ian Thompson ("Thompson") was a broker employed by H&P, who serviced Defendants Lawrence and Arman and the Amira Group. Thompson corresponded with Gunvor as an agent for Defendants Lawrence and Arman, and the Amira Group.  Despite being an H&P employee, Thompson used Amira and Nemsss company email addresses when corresponding with Gunvor:  it@amiraindustries.ch and ian@nemsss.com.

---

[1] According to the Virgin Islands Official Gazette, pursuant to Section 213(5) of the BVI Business Companies Act, 2004, Nemsss was stricken from the Register of Companies on May 31, 2017.

## JURISDICTION

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the action is between citizens of a state and a citizen or subject of a foreign state and the amount in controversy exceeds $75,000.

18.     This Court has personal jurisdiction over defendant Lawrence, who is a U.S. citizen and resides at 4009 N. Richmond St. Arlington, VA 22207. Moreover, upon information and belief, Defendant Lawrence made the false representations and/or participated in the fraudulent scheme that is the subject of this complaint from within this District.

19.     This Court has personal jurisdiction over defendant Arman, who is a U.S. citizen and resides at 4007 N. Richmond St. Arlington, VA 22207. Moreover, upon information and belief, Defendant Arman made the false representations and/or participated in the fraudulent scheme that is the subject of this complaint from within this District.

20.     This Court has personal jurisdiction over defendant Amira, which upon information and belief, is a Virginia limited liability company with its principal place of business at 10527 Providence Way, Fairfax VA 22030. Public records also indicate Amira uses 4009 N. Richmond St. Arlington, VA 22207 as its company address, which is the same address listed for Lawrence's residence.  Upon information and belief, Defendants Lawrence and Arman collectively own 100% of Defendant Amira.

21.     Alternatively, there is personal jurisdiction over Defendants Lawrence and Arman in this Court pursuant to Fed. R. Civ. P. 4(k)(2).

## VENUE

22.     Venue is proper here pursuant to 28 U.S.C. §1391(b)(1) & (2) and (d), as a substantial part of the events or omissions giving rise to the claim occurred in this District.

## BACKGROUND FACTS

### A.     The Initial Contact Between the Kayablian Brothers and Gunvor

23.     On or about March 22, 2016, Benoit Tarrazi ("Tarrazi"), a crude trader at Gunvor at the time, received an email from Jean Jacques Bovay ("Bovay"), a Geneva-based lawyer, stating that Bovay wanted to introduce Gunvor to Lawrence and Arman, the owners of a group of companies, which he referred to as *"Amira Industries,"* and which he said had developed a number of businesses in Iraq.  Bovay requested a meeting with Gunvor the following day. A true and correct copy of the March 22, 2016 Bovay email is attached as **Exhibit A**.

24.     Later on March 22, 2016, Tarrazi received an email from Thompson, who described himself as "*the [Fuel Oil] trader for Amira*." Thompson, who was actually a broker for H&P, stated that he wanted to arrange a meeting with Gunvor and H&P on behalf of Lawrence and Arman.  A true and correct copy of the March 22, 2016 Thompson email is attached as **Exhibit B**.

25.     Based on these communications, Gunvor agreed to a meeting.

### B.     The March 23, 2016 Meeting

26.     On or about March 23, 2016, Thompson and Neil Passmore ("Passmore") of H&P met with Doron Rolnik ("Rolnik"), a fuel oil trader at Gunvor. The meeting occurred at Gunvor's office in Geneva.

27.     At this meeting, Thompson and Passmore told Gunvor about Lawrence and Arman's fuel oil activities in Iraq and said that Lawrence and Arman were looking for a buyer for fuel oil which they were lifting out of an Iraqi refinery on an ongoing basis.  At the meeting, Thompson and Passmore provided Rolnik with a hard copy of a five-page document entitled "Nemsss Petroleum Ltd. - INVESTOR TEASER – IOTC REFINERY MASTER CONTRACT" (the "Teaser"). A true and correct copy of the Teaser is attached as **Exhibit C**.

28.     The Teaser stated, in relevant part:

a)      Nemsss Petroleum Ltd. (NEMSSS) is a BVI company with incorporation #1893585 and a registered office at Vanterpool Plaza, 2nd floor, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands.

b)      NEMSSS deals with various petroleum products and derivatives trade and services.

c)       One of NEMSSS' subsidiaries called Gulf Energy for Petroleum Services (GEPS) an Iraqi registered company, has been successfully operating in Iraq for the last few years.

d)      Recently, GEPS has been awarded the Dora Refinery tender contract from Iraqi Oil Tankers Company (IOTC). NEMSSS is marketing the Fuel Oil for sale outside Iraq.

e)      The contract awarded to GEPS is for 90,000-100,000 MT per month of straight run CST 180 Fuel Oil from the Dora Refinery in Iraq- this equates to 1.1M-1.2M tonnes of Fuel Oil per annum.

f)      It includes operational and quality discounts against a standard set of refinery specifications to enable transportation of the Fuel Oil from the refinery to the port (in this case Khor al Zubair in Basra).

g)      GEPS pays a monthly rate for the Fuel Oil which is determined by a set pricing formula included in the tender award contract based on Platts HSFO 180 cst & Fujairah Bunker wire 180.

h)      Another recent success for GEPS, it newly got awarded a Master contract within Iraq for the following listed Refineries:

i.      Shoeiba Refinery 30,000MT per month - 360,000MT per annum;

ii.     Alforat Al Awsat Refineries (Dewaniyah, Samawah, and Najjaf) 60,000MT per month - 720,000MT per annum;

iii.    Maysan Refinery 30,000MT per month - 360,000MT per annum.

i)      This will mean an extra 1.5M tonnes of Fuel Oil for NEMSSS to market, besides the Dora Refinery contract, meaning an annual exporting capability of 2.5M tonnes of Fuel Oil in 2016 (equivalent to 17.5M barrels).

j)      To further strengthen its position in Iraq and secure ongoing award tenders from the Iraqi Government, NEMSSS/GEPS require further strategic investment.

7

      k)      NEMSSS/GEPS are exploring potential long term partners whom are willing to invest in the funding of this project on a profit sharing basis.

29.      At the meeting, Thompson and Passmore also provided Rolnik with a hard copy of a forty-five page document entitled: "Fuel Oil (Bunker) Loading & Exporting From Multiple Refineries in Iraq" (the "Amalgamated Presentation"). A true and correct copy of the Amalgamated Presentation is attached as **Exhibit D**.

30.      The Amalgamated Presentation stated, in relevant part:

      a)      Iraqi Oil Tank Company (IOTC) published a public tender for the purchase of fuel oil from the Dora Refinery (IOTC Tender #3-2015) in November 2015.

      b)      Nemsss Petroleum Ltd. (NEMSSS) is a BVI company with incorporation #1893585 and a registered office at Vanterpool Plaza, 2nd floor, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands.

      c)      NEMSSS deals with various petroleum products and derivatives trade and services.

      d)      One of NEMSSS subsidiaries called Gulf Energy for Petroleum Services (GEPS) an Iraqi registered company, has been successfully operating in Iraq for the last few years.

      e)      Gulf Energy for Petroleum Services (GEPS) is assigned from Nemsss on this project and has submitted a commercial and a technical offer to IOTC on December 7th 2015.

      f)      GEPS was officially awarded the contract on February 1st, 2016.

      g)      GEPS has been in pre-mobilization mode for two months prior to the award, in preparation for the contract execution. Its staff has conducted preliminary meetings with Ministry of Oil (MOO) representatives. Port Authorities and various service providers. Meeting with IOTC employees, Dora Refinery employees and Khor Al Zubair (KAZ) Port Authorities employees were conducted.

      h)      Processes and interactions with the Ministry of Oil have been clearly identified. The interaction with the IOTC and the Dora Refinery as well as our relationship with the Dora Refinery have been analyzed.

31.     The Amalgamated Presentation also provides the following information regarding the oil produced by the Dora Refinery in Iraq:

a)      The Dora Refinery was built in 1953 and began operations in 1955. It is operated by Iraq's Midland Refineries Company (MRC). It is located 20 kilometers southwest of Baghdad. The Dora Refinery is Iraq's second-largest.

b)      GEPS did set up a team and premises at the Dora Refinery which allowed a close follow up of all daily activities from quantity allocations coming from IOTC to trucks loading at the refinery.

c)      Dora Refinery has produced an average of 10,000 MT a day for the past 5 months. Its average daily storage volume is approximately 30,000 MT.

d)      The prepayment process in order to lift fuel oil from the Dora Refinery is as follows:

    i.      IOTC Commercial department notifies GEPS of the Monthly available quantity and notifies GEPS to deposit down payment in USD at TBI Basra Branch;

    ii.     GEPS receives notification by email;

    iii.    GEPS transfers funds to TBI Basra IOTC Account;

    iv.     TBI Basra issues a transfer voucher Receipt in the name of GEPS confirming receipt of funds and amount received;

    v.      GEPS Basra Representative withdraws the Receipt from TBI Basra Representative delivers the Receipt to IOTC Financial Department;

    vi.     IOTC Financial Department acknowledges reception of Receipt;

    vii.    IOTC Financial Department sends a memo to IOTC Commercial department confirming reception of funds;

    viii.   GEPS Basra Representative takes a copy of the memo to the IOTC Commercial department;

    ix.     IOTC Commercial department acknowledges reception of the IOTC Financial department Memo GEPS Basra;

    x.      IOTC Commercial department sends a Memo to its distribution division requesting the issuance of Loading Orders for GEPS at the Dora Refinery;

xi.   GEPS Basra Representative takes a copy of the Memo IOTC Commercial department / distribution division sends the Loading Order to the Dora Refinery GEPS Basra Representative takes a copy of the Loading Order or date and reference of the Loading Order and sends the information to GEPS Dora representative GEPS Dora representative takes the lead and follows up with the Ministry of Oil distribution division;

xii.   Once IOTC issues the receipt confirming payment, the loading process at the Dora Refinery begins.

32.     Upon information and belief, the Investor Teaser and Amalgamated Presentation contained material misrepresentations of fact known to Lawrence and Arman, including but not limited to the information contained in paragraph 28(d), (e), and (h)(i-iii) and paragraph 30(c) noted herein.

33.     On the basis of the statements and representations made to Gunvor at this meeting, Gunvor agreed to a further meeting to discuss a possible business arrangement.

**C.**    **The April 1, 2016 Meeting**

34.     On or about April 1, 2016, a meeting was held in Gunvor's Geneva offices. The meeting was attended by Torbjorn Törnqvist ("Törnqvist"), Gunvor's CEO, and Rolnik, as well as Lawrence, Arman, Thompson, and Bovay.

35.     At the meeting, Lawrence introduced himself and Arman, describing them the principals of the fuel oil business that had been described to Gunvor at the March 23, 2016 meeting. Lawrence said that he and Arman each resided in the United States, and both had U.S. citizenship.

36.     At the meeting, Lawrence expanded on the prepayment process noted in the Amalgamated Presentation given to Gunvor at the March 23, 2016 meeting. In particular, Lawrence explained that IOTC's procedures required tender recipients, in this case, GEPS, to deposit prepayment funds into IOTC's bank account, upon which that tender recipient would be

entitled to lift oil from the applicable refinery in a quantity corresponding to the amount of the deposited funds.

37.     Lawrence told Gunvor that they were looking for a new joint venture partner who would be willing to purchase large volumes of Iraqi fuel oil and finance the prepayments to IOTC. Under the terms of the proposed joint venture (1) Gunvor would remit the prepayment funds to Nemsss; (2) Nemsss would remit the prepayment funds to GEPS; and (3) GEPS would deposit the prepayment funds in full into IOTC's bank account in order to lift fuel from the Iraqi refinery.

38.     At the meeting, Lawrence and Arman also proposed that, under the joint venture Nemsss would make all arrangements and incur all expenses on the shore-side, *i.e.*, lifting the fuel oil from the refinery and transporting it by truck to the port, and Gunvor would make all shipping arrangements and incur all the shipping-related expenses.  Nemsss and Gunvor would then share their expenses and their income from their respective sales of the fuel oil on a 50:50 basis.

39.     At the meeting, Lawrence said they wanted Gunvor to make an initial prepayment of $12,000,000 to purchase fuel oil from IOTC.  Gunvor advised it was not prepared to make an initial prepayment of $12,000,000, but would consider making an initial prepayment in the amount $3,000,000, on the express basis that the prepayment funds would be remitted in full into IOTC's bank account in order to lift fuel from the Iraqi refinery.  Lawrence promised, and Gunvor relied on the promise, that all prepayment funds would be remitted in full into IOTC's bank account.

**D.**     **The April 2016 Meeting and the First Prepayment**

40.     By email dated April 5, 2016, Thompson forwarded to Gunvor what Lawrence and Arman represented to be the "Dora Refinery Award in Arabic and English Translation." A true and correct copy of the April 5, 2016 email and "Dora Refinery Award in Arabic and English

Translation" is attached as **Exhibit E**. Upon information and belief, the Dora Refinery Award is a fabricated document created to perpetrate a fraud on Gunvor.

41.    On April 7, 2016, Törnqvist and Rolnik met with Lawrence and Thompson, among others, at Gunvor's offices.   At the meeting, Lawrence pressed Gunvor for the $3,000,000 prepayment.

42.    That same day, Thompson sent an email to Gunvor, with a copy to Lawrence and Arman, with a quick recap of what was agreed at the April 7, 2016 meeting. The email states, in relevant part:

> A 3 million USD advance credit facility payable immediately against a proforma invoice to NEMSSS account and to be maintained at a minimum of 3 million USD to facilitate the purchasing of FO from IOTC – the USD amount will increase based on NEMSSS requirement to lift more Fuel Oil from IOTC which is in line with the JV goal of lifting more Fuel Oil from IOTC.

A true and correct copy of the April 7, 2016 email is attached as **Exhibit F**.

43.    By email dated April 8, 2016, Mohamed A. El Ammawy, VP of Business Development for Amira Management B.V., which upon information and belief is part of the Amira Group, forwarded to Gunvor what Lawrence and Arman represented to be a true copy of the sales contract between GEPS and Nemsss. A true and correct copy of the April 8, 2016 email and "sales contract between GEPS and Nemsss" is attached as **Exhibit G**. Upon information and belief, the GEPS/Nemsss contract is a fabricated document created to perpetrate a fraud on Gunvor.

44.    By email dated April 8, 2016, Thompson forwarded to Gunvor what Lawrence and Arman represented to be "the Arabic version of the IOTC/GEPS original [Contract of Sale and Transportation of Quantities of Fuel Oil (Bunker) from Dora Refinery]" (the "IOTC/GEPS Contract").   A true and correct copy of the April 8, 2016 email and "IOTC/GEPS Contract" is

attached as **Exhibit H**. That same day, Thompson forwarded to Gunvor what Lawrence and Arman represented to be a draft of the "English translation" of the IOTC/GEPS Contract.

45.     By email dated April 9, 2016, Thompson forwarded to Gunvor what Lawrence and Arman represented to be "the final translation copy of the IOTC/GEPS contract." A true and correct copy of the April 9, 2016 email and "final translation copy of the IOTC/GEPS Contract" is attached as **Exhibit I**.

46.      Upon information and belief, the IOTC/GEPS Contract is a fabricated document created to perpetrate a fraud on Gunvor.  In particular, the document sent to Gunvor lists a Yahoo.com email address iotc-basrah@yahoo.com for IOTC, the Iraqi state-owned oil company; yet, the official IOTC website, provides info@iotc.oil.gov.iq as IOTC's email address.

47.     By email dated April 12, 2016, Arman wrote to Gunvor and stated:

> For compliance purposes, and since we do not have the contract signed, or the advance agreement signed. Could we have letter from you stating that the funds sent are prepayment for the April loading of Fuel Oil. If you could provide this, that would be great.

A true and correct copy of the April 12, 2016 email is attached as **Exhibit J**.

48.     On April 12, 2016, Gunvor, relying on Lawrence's express representation that all prepayment funds would be used "for the April loading of Fuel Oil," sent a letter to Nemsss confirming remittance of the initial prepayment of $3,000,000. The letter provides:

> By this letter, we, Gunvor SA, confirm that our prepayment of USD 3'000'000.00 transferred under the reference TRF/103102409 to your account with reference LB13005200070023010705932012 with value date 11/04/2016 is related to the April loading of Fuel Oil.

A true and correct copy of the April 12, 2016 letter is attached as **Exhibit K**.

49.     On April 13, 2016, Arman sent an email to Gunvor, which states: "As per your request please find attached the transfer receipt for the 3 Million USD from Gulf Energy to IOTC. We will send [Gunvor] the receipt from IOTC once we receive it." A true and correct copy of the April 13, 2016 email is attached as **Exhibit L**.

 Upon information and belief, Arman never sent the IOTC receipt to Gunvor.

50.     In the April 12, 2016 email, Arman enclosed a document from IBL Bank which allegedly shows a payment order from the account of "Gulf Energy for Petroleum Services Co." in the amount of USD 3,000,030.00 to the beneficiary "Oil Tanker Iraq." A true and correct copy of the April 12, 2016 email and the "IBL Bank" document is attached as **Exhibit M**. Upon information and belief, "Oil Tanker Iraq" is not IOTC.

51.     By email dated April 18, 2016, Gunvor asked Thompson to confirm that the payment terms agreed to under the proposed JV have been fully complied with.

52.     That same day, Thompson replied to Gunvor, copying Lawrence and Arman, and stating, in relevant part:

> The USD 3 million has already been paid to TBI [IOTC's bank] as down payment for Fuel Oil from the Refinery.
>
> The whole purpose of paying for the Fuel Oil loaded onto your vessels was to make sure NEMSSS wasn't carrying the cash flow problem again – in this scenario we are back to square one because the 3 million has been used to open up lifting from other refineries in Iraq which has happened and has been used only for this purpose.[2]

A true and correct copy of the April 18, 2016 Thompson email is attached as **Exhibit N**.

---

[2] In a meeting between Lawrence and Gunvor in September 2016, as described in further detail in paragraph 64 herein, Lawrence confirmed this representation is false and the prepayment funds were not used to purchase the fuel oil from IOTC.

E.      **The Operational Problems and the Second Prepayment**

53.     For the first shipment, Gunvor chartered the vessel MT "CAPE TALLINN."  The

CAPE TALLINN arrived at anchorage on April 25, 2016, and loading operations commenced the

same day by shore-to-shore transfer from feeder vessel MELI.

54.     Shore-side delays of uncommon and unusual duration were experienced during the

operations to load CAPE TALLINN.  The delays concerned Gunvor, so Rolnik raised them with

Thompson. Thompson said the delays had been caused by the non-payment of wages to truck

drivers resulting in a strike, but that the problem had been resolved.

55.     By email dated May 9, 2016, Thompson wrote to Gunvor and stated:

> A point from our bank IBL is that they will still need the same letter
> that you supplied for the previous USD 3 million pre-payment for
> this next tranche of USD 6 million pre-payment so once you have
> the SWIFT reference number to add to the letter if you could send
> that over as well that would be brilliant so that we can comply with
> their internal requirements.

A true and correct copy of the May 9, 2016 email is attached as **Exhibit O**.

56.     On May 9, 2016, Gunvor, relying on Thompson's representation that all

prepayment funds would be deposited into IOTC's account, sent a letter to Nemsss confirming

remittance of the second prepayment of US$ 6,000,000. The letter provides:

> By this letter, we, Gunvor SA, confirm that our prepayment of USD
> 6'000'000.00 transferred under the reference TRF/103127460 to
> your account with reference LB130052000700230107055932012
> with value date 09/05/2016 is related to the May loading of Fuel Oil
> FOB [Khor Al Zubair port] on the MT BALTIC GALAXY.

A true and correct copy of the May 9, 2016 letter is attached as **Exhibit P**.

57.     On May 12, 2016, Gunvor emailed Lawrence, Arman, and Thompson regarding

further delays of uncommon and unusual duration experienced during loading of the CAPE

TALLINN. In particular, Rolnik wrote: "[Gunvor] recently increased the prepayment by 6 M$ in

order to get MORE oil…Looks like we get even LESS oil than before. Please tell us urgently what is going on." A true and correct copy of the May 12, 2016 email is attached as **Exhibit Q**.

58.     The total volume that was eventually loaded on board the MT CAPE TALLINN was 49,938.898 MT in approximately one month.  This volume was half the amount Gunvor had expected, since in March-April 2016, Lawrence and Arman had told Gunvor they would be able to deliver 90,000-100,000 MT per month.

**F.     The August and September Prepayments and the September 2016 Meeting**

59.     On August 9, 2016, Nemsss sent Gunvor invoice number PF16090001 requesting a $4,000,000 prepayment for "Fuel Oil from Dora Refinery (Iraq) according to contract dated 26.01.2016." A true and correct copy of invoice number PF16090001 is attached as **Exhibit R**.

60.     On or about August 10, 2016, Gunvor remitted the $4,000,000 prepayment funds for the express purpose of logistical operations in connection with purchasing fuel oil from IOTC at the Dora Refinery.

61.     On September 8, 2016, Thompson emailed Gunvor, with a copy to Lawrence and Arman, and provided a "quick synopsis of the phone call [Thompson] just had with Lawrence." Thompson re-stated what Lawrence told him, which was:

> We have been awarded the Middle Euphrates fuel oil contract and the Shaibah Fuel Oil contract by IOTC.
>
> Clearly we now need to make sure that having been awarded the extra 2 tenders from IOTC Lawrence has the funds in his account to ensure that we can load uninterrupted from all 3 refineries at the 4,000MT per day allocation.
>
> We know we have the truck capacity to load these volumes but we now need GUNVOR financial muscle to ensure we maintain our supply of fuel oil [from] IOTC – we cannot afford to miss any pre-payments and run the risk of the product being re-allocated through our inability to pre-pay if Lawrence is short of funds.

To that end it is imperative that we speak tonight and work out a way forward to get funds to Lawrence tomorrow so that he can transfer the cash directly to IOTC (with receipts of course as usual) to ensure we can load the extra volumes in full beginning this Sunday/Monday.

A true and correct copy of the September 8, 2016 email is attached as **Exhibit S**.

62.     Upon information and belief, Lawrence and Arman's representation that "[w]e have been awarded the Middle Euphrates fuel oil contract and the Shaibah Fuel Oil contract by IOTC" was false.

63.     On September 12, 2016, Rolnik sent an email to Thompson, with a copy to Lawrence and Arman. The email provides, in relevant part:

I understand Lawrence will be meeting [Törnqvist] on Wednesday. Needless to say, we will need an explanation and clear scheme on:

1. Where did our 13M$ go?

2. Where did go [sic] all the money we paid on each lifting?

Overall, on cash + cargoes we already paid 13M$ + 22M$ so about 35M$ for 126kt only! Where is the money?

3. Can we have access to GEPS bank accounts?

4. On what scheme we can expect to recover money?

You can easily understand that we are all shocked here by the way things seem to evolve and that situation is worsening although volumes are increasing. The sooner we get an explanation, the better it is.

A true and correct copy of the September 12, 2016 email is attached as **Exhibit T**.

64.     On or about September 14, 2016, Lawrence met with Törnqvist and advised he spent the $13,000,000 prepayments, remitted by Gunvor in April, May, and August 2016, on "working capital" for the benefit of the joint venture.  Lawrence also advised that he did not

transfer all of the prepaid funds directly to IOTC's bank account for the lifting of fuel oil, despite previous representations to the contrary.

65.     At the September 14, 2016 meeting, Lawrence requested a $12,000,000 prepayment. Upon information and belief, Lawrence told Gunvor the $12,000,000 prepayment funds would be deposited into IOTC's bank account for the express purpose of purchasing fuel oil from IOTC.

66.     Following the meeting, Thompson emailed Gunvor, with a copy to Lawrence and Arman, and stated:

> Please find attached pre-payment invoice for $12m as requested.
>
> Anything related to financial matters for Amira/NEMSSS please only include those emails cc'd above from Amira side going forward.

A true and correct copy of the September 14, 2016 email is attached as **Exhibit U**.

67.     At the time, Gunvor desperately needed additional fuel oil from IOTC in order to finish loading the vessel MT BALTIC GALAXY.  The vessel had been in the port of Iraq since May 2016 and had already taken on some fuel, but was still waiting for additional fuel oil to be delivered.

68.     The delay in loading the BALTIC GALAXY was resulting in significant financial damage to Gunvor. Lawrence was aware that the BALTIC GALAXY was partially loaded and could not depart until fully loaded.

69.     On or about September 15, 2016, Gunvor, needing to complete the loading of the BALTIC GALAXY, relied on Lawrence's express representation that the $12,000,000 prepayment would be deposited into IOTC's account to purchase the required fuel oil from IOTC and remitted the $12,000,000 prepayment.

### G.   The Unexplained Wire Transfers

70.   As of September 2016, Gunvor had remitted three prepayments totaling approximately $21,000,000, with express instructions that the prepayment funds were to be deposited in full directly into IOTC's account for the purchase of fuel oil.

71.   On or about October 21, 2016, after reviewing the various payment orders/credit advices and bank print-outs purporting to evidence receipt of the prepayment funds into IOTC's account, Gunvor compiled the data into a spreadsheet and sent a copy to Thompson.  The data in the spreadsheet showed between April 2016 and October 2016, GEPS sent twenty nine wire transfers, totaling $43,405,000, to various beneficiaries, including "Oil Tanker Iraq," "Mostapha Hachem Lazem," and "NIB/Gulf Energy Co." Upon information and belief, "Oil Tanker Iraq," "Mostapha Hachem Lazem," and "NIB/Gulf Energy Co." are not IOTC or entities benefitting the joint venture. As such, in the email, Gunvor asked the following questions:

> Pls look at the beneficiaries:
>
> - Who is Mostapha Hachem Lazem? (transfer of 400 k on 12.04.2016)
>
> - The account NIB 99187 belongs to Gulf?
>
> If I am not [mistaken] [$]33,325,000 went straight to oil tanker Iraq and [$]9,590,000 went to nib gulf account 99187 (?)
>
> I would appreciate if you could check this out.

A true and correct copy of the October 21, 2016 email and spreadsheet is attached as **Exhibit V**.

72.   On the same date, Thompson responded to Gunvor's email and advised he asked Lawrence to "clarify exactly what all of the payment instructions/orders [Lawrence] gave to [Gunvor] yesterday relate to and for what purposes they were made."  A true and correct copy of the October 21, 2016 Thompson email is attached as **Exhibit W**.

73.   Also on the same date, Thompson sent an email to Gunvor stating, in part:

> I have requested from [Lawrence's office in Beirut, Lebanon] the actual IOTC purchase receipts (not just the bank transfers from GEPS to IOTC bank account that we [gave] to you in our meeting yesterday) so that we can know the final purchase price of the fuel oil for the JV.
>
> We also need to see (and I have already requested) the IOTC purchase receipts for total volume of purchased fuel oil and we also need the BALTIC GALAXY and UNITED GRACE trucking and landside cost invoices to complete the same reconciliation process for those also.
>
> I will push **Amira (NEMSSS)** for all of those documents again over the next few days to make sure we are all comfortable with the documentation for our audit purposes. (Emphasis added.)

A true and correct copy of the October 21, 2016 Thompson email is attached as **Exhibit X**.

## H.   The October 27, 2016 Meeting

74.   On or about October 27, 2016, there was a meeting in Geneva between Törnqvist, Rolnik, and Lawrence, among others. The purpose of the meeting was to discuss various issues, including cash flow and the use of Gunvor's $25,000,000 prepayment funds.

75.   At the meeting, Lawrence told Gunvor he did not spend the prepayment funds for the purchase of fuel from IOTC, as previously represented. Instead, Lawrence told Gunvor he allegedly spent the prepayment funds on security costs, "seed capital," a performance bond, and landside costs for the benefit of the joint venture. Gunvor asked Lawrence to provide documentation supporting these alleged expenses and payments and Lawrence was unable to do so.

## I.   The November Prepayment and November/December Meetings

76.   In or about October 2016, Lawrence requested a $3,000,000 prepayment for fuel oil from IOTC. Upon information and belief, Lawrence told Gunvor that the $3,000,000

prepayment funds would be deposited into IOTC's bank account for the express purpose of purchasing fuel oil from IOTC.

77.　Gunvor required additional fuel oil from IOTC in order to finish loading the UNITED GRACE, which had been waiting at the Iraqi port of Khor Al Zubair since September 2016, and the SIGMA TRIUMPH, which arrived earlier in the month.

78.　The delay in loading the UNITED GRACE was resulting in financial damage to Gunvor. Lawrence was aware that the UNITED GRACE was partially loaded and could not depart until fully loaded. Lawrence also knew that Gunvor needed fuel to load the SIGMA TRIUMPH.

79.　On or about November 2, 2016, on reliance of Lawrence's statement that the prepayment funds would be used to purchase fuel oil from IOTC, Gunvor remitted a final prepayment in the amount of $3,000,000.

80.　On November 6, 2016, Rolnik emailed Lawrence and Arman, among others, and stated, in part:

> In order to prepare [for] our next meeting (Friday 11 November 2016), we would highly appreciate to get some clarifications on the fuel financials we discussed recently and the way our 25M$ (+3M$ more now…) were used. We would also need some explanations regarding the economics of this project. As a reminder, I put in attachment several files we got from you guys regarding the IOTC Prepayments, the "investor teaser" presented to us and info about the performance bond with IOTC.

A true and correct copy of the November 6, 2016 email is attached as **Exhibit Y**.

81.　On or about November 29 to December 1, 2016, Gunvor employees Hanna Merei ("Merei") and Simon Rubli ("Rubli") attended Lawrence's office in Beirut, Lebanon.  The purpose of the trip was to find out what had happened to Gunvor's $28,000,000 prepayment funds, which included $24,000,000 to purchase fuel oil from IOTC and $4,000,000 for logistical operations in connection with the purchase of fuel oil from IOTC.

21

82.     On or about November 30, 2016, Feisal Chalabi ("Chalabi") and Ghada Maamari ("Maamari") of GEPS invited Rubli and Merei to have dinner with them. Upon information and belief, Maamari and Chalabi told Rubli and Merei they suspected Lawrence and Arman had utilized Gunvor's prepayments for purposes unrelated to the purchase of fuel.

83.     Maamari and Chalabi further advised that the Dora Refinery is compelled by the Iraqi government to provide the majority of the fuel oil which it produces to the Iraqi Ministry of Energy, other government users and factories in Iraq as a priority, with the balance leftover going to privately awarded tenders.

84.     Approximately 60% of the oil from the Dora Refinery is sent to the Iraqi government every month and the remaining 40% is sent to the private sector, including GEPS. Based on this, Maamari and Chalabi advised that it was not possible for Lawrence and Arman to obtain from the IOTC the "90,000-100,000 MT per month of straight run CST 180 Fuel Oil from the Dora Refinery in Iraq," as stated in the March 2016 Teaser, nor "an average of 10,000 MT a day" from the Dora Refinery, as stated in the March 2016 Amalgamated Presentation.  They further advised that Lawrence and Arman had known this from the outset.

**J.     Correspondence in June 2017 and Gunvor's Proposed Audit**

85.     In early June 2017, Gunvor requested a meeting with Lawrence and Arman in order to conduct an audit of the prepayment funds and other alleged expenses related to the fuel oil purchased from IOTC.

86.     By email dated June 7, 2017, Paulina Arwa ("Arwa") of Nemsss confirmed the meeting and attached an updated Profit and Loss (P&L) statement, along with two invoices. A true and correct copy of the June 7, 2017 email is attached as **Exhibit Z**.

87.     The P&L attached to Arwa's email included further expenses that had not been agreed by Gunvor and that were in addition to the expenses which Gunvor had asked Lawrence and Arman to explain during the November-December 2016 meeting. In particular, Gunvor never agreed to the following expenses identified on the P&L:

a)      US$ 750,000.00 for *"renewal stamp duty"*;
b)      US$ 1,500,000.00 for *"renewal fee"*;
c)      US$ 877,978.90 for *"legal fees"*;
d)      US$ 1,220,218.60 for *"travels"*;
e)      US$ 1,944,003.00 for *"head office expenses"*;
f)      US$ 1,131,799.50 for *"entertainment"*; and
g)      US$ 4,500,000.00 for *"Supervision $300K/month x15 month."*

88.     Gunvor rejected these expenses and asked Lawrence and Arman for an explanation.

89.     The audit that Gunvor proposed never occurred, as shortly after the emails mentioned above were sent, Lawrence and Arman stopped communicating with Gunvor.

**K.    Gunvor's Claim**

90.     Gunvor remitted a total of $28,000,000 as follows:

| Date | Amount of prepayment (US$) |
|---|---|
| April 11, 2016 | $3,000,000 |
| May 9, 2016 | $6,000,000 |
| August 10, 2016 | $4,000,000[3] |
| September 15, 2016 | $12,000,000 |
| November 2, 2016 | $3,000,000 |
| **Total:** | **$28,000,000** |

91.     Gunvor made the requested prepayments, each time relying on Lawrence and Arman's express representation that the prepaid funds would be deposited directly into IOTC's bank account and then the fuel oil would be lifted against the deposited funds.

---

[3] Gunvor remitted the August 2016 payment for logistical operations in connection with the purchase of fuel oil from IOTC.

92.     The prepayments were made on the basis that they were considered credit which would be applied against the sale price of the fuel charged to Gunvor.  Following each lifting, final settlement was supposed to occur, with Gunvor being invoiced along with a quality discount.  This never happened and no discount was ever given.

93.     Gunvor agreed to pay the full price for the fuel oil, in addition to making the prepayments, on the promise that the agreed credit would be applied down the line and with accounting adjustments being made accordingly. Gunvor paid the following amounts to purchase the actual fuel oil lifted for each vessel:

| Vessel | Amount paid for fuel oil lifted |
|---|---|
| CAPE TALLINN | $7,864,522.25 |
| BALTIC GALAXY | $18,334,202.05 |
| UNITED GRACE into SIGMA TRIUMPH | $23,012,473.62 |
| UNITED GRACE II | $28,268,719.10 |
| RED SUN | $11,721,892.21 |
| SULU SEA | $7,550,603.22 |
| MAKHAMBET 27 & 28 | $4,064,687.64 |
| **Total:** | **$100,817,100.09** |

94.     The total amount that Gunvor paid to Lawrence and Arman, including the prepayments of $28,000,000 and the purchase price of the fuel came to $124,582,520.55. However, the total value of the fuel oil delivered to Gunvor was $100,817,100.09.

95.     Gunvor asked Lawrence and Arman to return the $23,765,420.46 and Lawrence and Arman refused to do so.

96.     In addition to Gunvor's loss of $23,765,420.46 in connection with the Lawrence and Arman's fraudulent scheme, Gunvor also suffered further damages and or incurred further liabilities as a consequence of the fraud, including, but not limited to, at least $9,631,619 in delay costs relating to Defendants' failure to timely provide fuel as promised.

## CAUSES OF ACTION

## COUNT I

## FRAUD

97.     Gunvor repeats and re-alleges each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

98.     This action is brought, in the first instance, to demonstrate Defendants committed a fraud by using Gunvor's $24,000,000 prepayment funds and $4,000,000 logistics funds for purposes unrelated to the purchase of fuel and then failing to return the funds to Gunvor.

99.     Gunvor remitted a total of $24,000,000 in prepayments and $4,000,000 logistics funds, each time on the express representations that Defendants Lawrence and Arman would transfer the funds into IOTC's bank account and then lift fuel oil against the deposited funds. As such, the $28,000,000 should be easily traced from the bank accounts of Gunvor → Nemsss → GEPS → IOTC. While Gunvor has records of the wire transfers showing it sent the prepayments to Nemsss, there are no records showing the prepayments were transferred from Nemsss to GEPS. Moreover, between April 2016 and October 2016, GEPS sent at least twenty-nine (29) wire transfers totaling $43,405,000 to various beneficiaries, including "Oil Tanker Iraq," "Mostapha Hachem Lazem," and "NIB/Gulf Energy Co."  There should only be wire transfers for the full amounts of the prepayments between GEPS and IOTC, not twenty-nine transfers for various amounts and to various beneficiaries. In addition, GEPS transferred funds to "Oil Tanker Iraq," "Mostapha Hachem Lazem," and "NIB/Gulf Energy Co." None of these beneficiaries is "IOTC" or provided services for the benefit of the joint venture. Upon information and belief, IOTC never received Gunvor's prepayments.

100.    With respect to the above transfers, Gunvor repeatedly asked Defendants Lawrence and Arman to provide the actual IOTC purchase receipts, not just bank transfer records from GEPS to IOTC's alleged bank account. The purchase receipts normally would be kept in the normal course of business and thus should have been readily available; yet they were never provided. Upon information and belief, IOTC never received Gunvor's prepayments.

101.    The total amount that Gunvor paid to Defendants Lawrence and Arman, including the $24,000,000 prepayments, $4,000,000 logistics funds and the purchase price of the fuel came to $124,582,520.55. However, the total value of the fuel oil delivered to Gunvor was only $100,817,100.09. Lawrence and Arman never provided a satisfactory explanation for the missing prepayment funds, and failed to provide the IOTC purchase receipts or any other supporting documentation showing the prepayment funds were used to purchase fuel oil.

102.    Defendants Lawrence and Arman made material representations of fact to Gunvor, including a representation that they could provide Gunvor between 90,000 MT and 100,000 MT of straight run fuel oil per month, all of which Gunvor relied upon to its detriment, as those representations caused Gunvor to remit $124,582,520.55 to Lawrence and Arman, despite only receiving US $100,817,100.09 in fuel oil, and incurring no less than US $9,631,619 in delay costs.

103.    Moreover, Defendants Lawrence and Arman knew from the outset in March-April 2016, they were unable to obtain from the IOTC the volumes of fuel oil stated in the March 2016 Teaser. As such, Defendants Lawrence and Arman knew their representations were false when they made them, and Defendants benefitted from those false representations.

104.    Defendants Lawrence and Arman's misrepresentations were made knowingly and willfully with the intent that Gunvor rely on them, and also with the intent by Defendants to cause the harm suffered by Gunvor.

26

105.     Gunvor relied upon Defendants Lawrence and Arman's misrepresentations and, in reliance on them, Gunvor has suffered damages in an amount to be proven at trial, but not less than $33,397,039.46.

## COUNT II

## **FRAUDULENT INDUCEMENT**

106.     Gunvor repeats and re-alleges each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

107.     In or about March – April 2016, Defendants Lawrence and Arman and/or their agents told Gunvor they, through Amira and/or Nemsss and/or GEPS, could supply to Gunvor between 90,000-100,000 MT per month of fuel oil from the Dora Refinery in Iraq.

108.     Further, in March 2016, Lawrence and Arman and/or their agents provided Gunvor with the Teaser and an Amalgamated Presentation referenced in detail in paragraphs 28-31, *supra*.

109.     Upon information and belief, approximately 60% of the oil from the Dora Refinery is sent to the Iraqi state every month and the remaining 40% is sent to the private sector, including GEPS. Defendants Lawrence and Arman knew from the outset they were unable to obtain from the IOTC the volumes of fuel oil stated in the March 2016 Teaser and Amalgamated Presentation.

110.     Defendants Lawrence and Arman knowingly made false statements to Gunvor regarding the volume of fuel available from IOTC to induce Gunvor to enter into a joint venture with them.

111.     Gunvor relied in fact on Defendants Lawrence and Arman's representations when it entered into the joint venture with them.

112.    As a result of Defendants Lawrence and Arman's intent to fraudulently induce Gunvor into entering the joint venture, Gunvor suffered damages in an amount to be proven at trial, but not less than $33,397,039.46.

## COUNT III

## CONVERSION

113.    Gunvor repeats and re-alleges each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

114.    Defendants, through their fraud, have intentionally, willfully, and unlawfully taken, acquired, appropriated, kept, used, and exercised domain and control over Gunvor's funds, which should have been (but were not) used to purchase fuel oil, thus depriving Gunvor of its right to use or possess said funds.

115.    Defendants had no right or permission to retain such funds.  Further, Defendants failed to surrender such property to Gunvor upon Gunvor's demand.

116.    By causing the deprivation of Gunvor's use and enjoyment of its property, Defendants' conduct has directly caused Gunvor to suffer damages in an amount to be proven at trial, but not less than $23,765,420.46.  Because Defendants' conduct was willful and wanton, the imposition of punitive damages is warranted.

## COUNT IV

## UNJUST ENRICHMENT

117.    Gunvor repeats and re-alleges each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

118.    Gunvor conferred a benefit upon Defendants through their investment in the parties' informal JV and prepayments for fuel oil.

119.     Defendants had knowledge of the benefits conferred by Gunvor because Defendants retained and used the funds that Gunvor provided, including by diverting such funds for personal use.

120.     Defendants' retention of this benefit was inequitable because Gunvor provided funds to Defendants based on their misrepresentations and other fraudulent conduct, and because Defendants failed to deliver the amount of oil promised in exchange for the funds.

121.     Therefore, Defendants have been unjustly enriched through retaining a sum of not less than $23,765,420.46 of Gunvor's funds, including the above described fraud, conversion and theft of Gunvor's funds.

122.     As a proximate cause of Defendants Lawrence and Arman's actions, Gunvor has suffered damages in an amount to be proven at trial, but not less than $23,765,420.46.

## COUNT V

## NEGLIGENT MISREPRESENTATION

123.     Gunvor repeats and re-alleges each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

124.     Defendants Lawrence and Arman represented to Gunvor on various occasions that the $28,000,000 prepayments would be deposited with IOTC and used to purchase fuel oil. Defendants Lawrence and Arman knew or should have known these representations were false.

125.     Defendants Lawrence and Arman intended that Gunvor should rely upon their representations and that Gunvor would continue to remit the prepayment funds.

126.     Gunvor relied in fact on Defendants Lawrence and Arman's representations and thus continued to remit $28,000,000 prepayments, in installments, as follows:

| Date | Amount of prepayment (US$) |
|---|---|
| April 11, 2016 | $3,000,000 |
| May 9, 2016 | $6,000,000 |
| August 10, 2016 | $4,000,000[4] |
| September 15, 2016 | $12,000,000 |
| November 2, 2016 | $3,000,000 |
| **Total:** | **$28,000,000** |

127.    As a result of Defendants Lawrence and Arman's negligent misrepresentations, Gunvor suffered damages in the sum of not less than $33,397,039.46, no part of which has been paid although duly demanded.

## COUNT VI

## CIVIL CONSPIRACY

128.    Gunvor repeats and re-alleges each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

129.    Defendants Lawrence and Arman agreed and acted in concert with one another and other unknown individuals to defraud Gunvor by inducing Gunvor to (1) enter the informal JV and provide funds for the sale of fuel oil by using the misstatements, misrepresentations, and false documents, as described in detail above, and (2) tortiously converting Gunvor's funds for their own use.

130.    As a result of Defendants Lawrence and Arman's agreement together and with other individuals to accomplish such unlawful purposes, Gunvor has been damaged and divested of the profits that it reasonably should have derived from the sale of the fuel oil.

---

[4] Gunvor remitted the August 2016 payment for logistical operations in connection with the purchase of fuel oil from IOTC.

131.    As a proximate cause of Defendants Lawrence and Arman's actions, Gunvor has suffered damages in an amount to be proven at trial, but not less than $33,397,039.46.  Further, Defendants' conduct was willful and wanton, warranting the imposition of punitive damages.

## COUNT VII

## <u>ALTER EGO</u>

132.    Gunvor repeats and re-alleges each and every allegation hereinabove set forth, with the same force and effect as if herein repeated and set forth at length.

133.    Upon information and belief, Defendants Lawrence and Arman directly or indirectly own the Amira Group, including Defendant Amira and non-party Nemsss, in whole or in part, and ultimately exercises complete dominion and control over them.

134.    Upon information and belief, the officers, directors, operators, and owners of each of the entities in the Amira Group, including non-parties Nemsss and GEPS, are the same and/or are substantially the same. In particular, Defendants Lawrence and Arman are the controlling shareholders, directors, and/or officers of the companies in the Amira Group, including Defendant Amira and non-party Nemsss.

135.    Upon information and belief, Nemsss was patently undercapitalized to operate the substantial business in which it was engaged with Gunvor.

136.    The organizational form of Nemsss has been manipulated to the detriment of Gunvor such that once Gunvor put Lawrence and Arman on notice of their claim, Nemsss was stricken from the British Virgin Islands Register of Companies on May 31, 2017.

137.    Lawrence and Arman have dominated their companies, including Defendant Amira, and non-parties Nemsss and GEPS, such that the companies function as their alter egos,

and/or have used their organizational forms in such a manner that Nemsss's partner Gunvor has suffered injustice and inequity, and possibly outright fraud.

138.   Defendants have a commonality of operation, control, and routinely transfer funds between each other such that entities within the group are alter egos of the others.

139.   Upon information and belief, the Defendants possess, transfer and/or hold funds of, or for the benefit of, one another, and make and receive payments for, and on behalf of, the other Defendants, pooling the resources without regard to corporate separateness, and without entering into an arm's-length negotiated contract to provide such services.

140.   Despite being an H&P employee, Thompson used Amira and Nemsss company email addresses when corresponding with Gunvor: it@amiraindustries.ch and ian@nemsss.com.

141.   At all material times, Lawrence and Arman used email addresses associated with Amira Industries N.V.[5] – lk@amiraindustries.ch and ak@amiraindustries.ch – when corresponding with Gunvor on behalf of Nemsss.

142.   At all material times, Ghada Maamari used Nemsss business cards but corresponded with Gunvor using Nemsss and GEPS corporate email accounts.

143.   Defendant Amira uses 4009 N. Richmond St. Arlington, VA 22207, the same address listed for Lawrence's residence, for some company business.

144.   In light of the foregoing, Defendants Lawrence and Arman and the Amira Group of companies, including Defendant Amira, are alter egos of each other under veil piercing

---

[5] According to its website, Amira Industries, N.V. is an Anguilla IBC with registration number 2159068 and has a registered office in Anguilla, B.V.I.  *See* http://www.amiraindustries.ch/management.html.  Upon information and belief, Amira Industries, N.V. is in the Amira Group.  Defendants Lawrence and Arman are principals and officers of Amira Industries, N.V. as well.  *Id.*

principles imposing personal liability for misuse of the corporate form and are liable for Gunvor's damages in an amount to be proven at trial, but not less than $33,397,039.46.

**WHEREFORE**, Gunvor demands that this Court enter judgment in its favor and against Defendants:

1. Awarding Plaintiff damages in an amount to be determined at trial, but in no event less than $33,397,039.46 on Counts I, II, V, VI and VII asserted in the verified complaint together with interest, costs and attorney's fees;

2. Awarding Plaintiff damages in an amount to be determined at trial, but in no event less than $23,765,420.46 on Counts III and IV asserted in the verified complaint together with interest, costs and attorney's fees;

3. Gunvor demands judgment against the defendants, jointly and severally, in an amount to be determined at trial, but in no event less than $33,397,039.46 on Counts I, II, V, VI and VII and no less than $23,765,420.46 on Counts III and IV, together with interest, costs and attorney's fees;

4. Awarding Plaintiff such other and further relief as this Court deems just and proper.

Dated: July 27, 2018

/s/Kierstan L. Carlson_____
Kierstan L. Carlson (VA Bar No. 81939)
Carlson@blankrome.com
BLANK ROME LLP
1825 Eye Street NW
Washington, DC 20006
Tel: 202-420-2200
Fax: 202-420-2201
*Counsel for Plaintiff Gunvor SA*

Of Counsel:
William R. Bennett, III*
Lauren B. Wilgus*
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
*Pro hac vice application pending*

## **VERIFICATION**

I, Doron Rolnik, hereby certify and say that I am the plaintiff in the within action.  I have read the complaint and its contents are true to my personal knowledge.  I hereby certify that the foregoing statements made by me are true.  I am aware that if any are willfully false I am subject to punishment.

Date:  July 24, 2018

_____