**From:** JJ Bovay [mailto:jjbovay@gmail.com]
**Sent:** mardi, 22. mars 2016 11:14
**To:** TARRAZI Benoit
**Subject:** Iraqi Fuel Oil

Bonjour Benoit,

Je suis en contact avec le groupe Amira Industries dont le principal est Lawrence Kayablian.

Nous avons développés ensemble plusieurs affaires en Iraq. Lawrence a gagné récemment un appel d'offres (SOMO/IOTC) pour du fuel oil (4,000,000 MT/an). Une partie de cette allocation a été vendue à Optima.

Je sais que Gunvor enlève du Basra Light.

Est-ce que l'on pourrait te voir demain vers 17h00 pour parler du fuel?

Bien à toi

Jean Jacques
Etude Bionda
1 Place du Port
1204 Genève

jjbovay@gmail.com
Tel 0041-78-815-1818

This message, including any attachments, is confidential. If you are not the intended recipient, please telephone or email the sender and please delete this message and any attachments from your system. If you are not the intended recipient you should not copy this message or its attachments or disclose their contents to any other person.

**From:** Ian Thompson [mailto:it@hannamandpartners.com]
**Sent:** mardi, 22. mars 2016 12:35
**To:** TARRAZI Benoit
**Cc:** jjbovay@gmail.com
**Subject:** Meeting Tomorrow and FO Specs

Dear Benoit
Cc JJ

JJ has very kindly forwarded your email address to me to arrange a meeting with you at 14:30hrs tomorrow in Geneva

Would that be possible?

I am the FO trader for Amira who have recently been awarded a large FO contract in Iraq

I attach the most recent straight run 180CST FO specs and hope that we can discuss further in our meeting tomorrow

Kind Regards

Ian

TEST METHOD RESULT

Density @ 15 C g/ml (Vac.) D-1298 0.9692
API Calculated 14.41
Flash Point P.M. C IP 170 100
Sulphur content. % Wt. D-4294 4.30
Water content 0.1
Kinematic Viscosity @ 50 C, cSt D- 445 283.0
Pour Point, Deg. C D- 97 + 6
Ash content % Wt. D- 482 0.039
Carbon Residue % Wt. D- 189 9.86


**Ian Thompson**

**Hannam & Partners**
2 Park Street
London W1K 2HX

**m:**+44 7552 277527

it@hannamandpartners.com

Hannam & Partners (Advisory) LLP 2 Park Street London W1K 2HX
Telephone: +44 (0)20 7907 8500
Registered in England no. OC386968 with registered office as above.
Authorised and regulated by the Financial Conduct Authority.

Hannam & Partners is the trading name of Hannam & Partners (Advisory) LLP and certain other of its group undertakings.

Privileged and/or confidential information may be contained in this e-mail and in any files attached, and is intended only for the use of the addressee. If you received this e-mail in error, please delete it from your system without copying it and notify the sender by reply e-mail, so that our records can be corrected. Thank you.

# NEMSSS PETROLEUM LTD.

# INVESTOR TEASER

## IOTC REFINERY MASTER CONTRACT



- **Nemsss Petroleum Ltd. (NEMSSS)** is a BVI company with incorporation #1893585 and a registered office at Vanterpool Plaza, 2nd floor, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands.

- NEMSSS deals with various petroleum products and derivatives trade and services.

- One of NEMSSS subsidiaries called **Gulf Energy for Petroleum Services (GEPS)** an Iraqi registered company, has been successfully operating in Iraq for the last few years.

- Recently, GEPS has been awarded the Dora Refinery tender contract from Iraqi Oil Tankers Company (IOTC). NEMSSS is marketing the Fuel Oil for sale outside Iraq.



- The contract awarded to GEPS is for 90,000-100,000 MT per month of straight run CST 180 Fuel Oil from the Dora Refinery in Iraq– this equates to 1.1M-1.2M tonnes of Fuel Oil per annum

- It includes operational and quality discounts against a standard set of refinery specifications to enable transportation of the Fuel Oil from the refinery to the port (in this case Khor al Zubair in Basra).

- GEPS pays a monthly rate for the Fuel Oil which is determined by a set pricing formula included in the tender award contract based on Platts HSFO 180 cst & Fujairah Bunker wire 180



- Another recent success for GEPS, it newly got awarded a Master contract within Iraq for the following listed Refineries:

1. Shoeiba Refinery 30,000MT per month – 360,000MT per annum

2. Alforat Al Awsat Refineries (Dewaniyah, Samawah, and Najjaf) 60,000MT per month – 720,000MT per annum

3. Maysan Refinery 30,000MT per month – 360,000MT per annum

- This will mean an extra 1.5M tonnes of Fuel Oil for NEMSSS to market, besides the Dora Refinery contract, meaning an annual exporting capability of 2.5M tonnes of Fuel Oil in 2016 (equivalent to 17.5M barrels).

- To further strengthen its position in Iraq and secure ongoing award tenders from the Iraqi Government, NEMSSS/GEPS require further strategic investment.

- NEMSSS/GEPS are exploring potential long term partners whom are willing to invest in the funding of this project on a profit sharing basis.

## Illustrative Example based on Feb quotations:



| | Delivery Singapore $/MT | Delivery Fujairah $/MT | FOB $/MT |
|---|---|---|---|
| Price paid to IOTC | 160.00 | 160.00 | 160.00 |
| Trucking Costs | 26.00 | 26.00 | 26.00 |
| Port Fees | 8.00 | 8.00 | 8.00 |
| Pumping System | 5.00 | 5.00 | 5.00 |
| **Total Landside Costs** | 199.00 | 199.00 | 199.00 |
| Freight | 25.00 | 20.00 | 0.00 |
| Demurrage Costs, Blending Costs | 10.00 | 5.00 | 0.00 |
| Hedging Costs | 5.00 | 5.00 | 0.00 |
| **Total Seaside Costs** | 40.00 | 30.00 | 0.00 |
| **Total Delivery Cost** | 239.00 | 229.00 | 199.00 |
| Operational Discount | -55.75 | -55.75 | -55.75 |
| Quality Discount | -30.00 | -30.00 | -30.00 |
| **Total Delivery Cost (minus discounts)** | 153.25 | 143.25 | 113.25 |
| **Estimated Sale Price** | 190.00 | 170.00 | 130.00 |
| Profit per MT | 36.75 | 26.75 | 16.75 |
| Profit for 2.5M tonnes of FO ($) | 91,875,000.00 | 66,875,000.00 | 41,875,000.00 |

*Values that vary on monthly basis

 

# Fuel Oil (Bunker) loading & Exporting
# From multiple refineries in Iraq

## Acronyms

| | |
|---|---|
| GCP1 | General Company for ports of Iraq |
| GEPS | Gulf Energy for Petroleum Services |
| GET | Gulf Energy for Transport |
| IQD | Iraqi Dinar |
| IOTC | Iraqi Oil Tank Company |
| JWA | Jawharat Adan |
| KAZ | Khor Al Zubair |
| MOE | Ministry of Electricity |
| MOI | Ministry of Industry |
| MOO | Ministry of Oil |
| MRC | Midland Refinery Company |
| MT | Metric Tons |
| OPC | Oil Pipeline Company |
| SOMO | State Oil Marketing Organization |
| SRC | South Refinery Company |
| TBI | Trade Bank of Iraq |
| USD | United States Dollars |
| UQ | Umm Qasr |
| VR | Vacuum residue |

# 1   Executive Summary

## 1.1   Presentation

Iraqi Oil Tank Company (IOTC) published a public tender for the purchase of fuel oil from the Dora refinery (IOTC Tender #3-2015) in November 2015.

**Nemsss Petroleum Ltd. (NEMSSS**) is a BVI company with incorporation #1893585 and a registered office at Vanterpool Plaza, 2nd floor, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands.

NEMSSS deals with various petroleum products and derivatives trade and services.

**One of NEMSSS subsidiaries called Gulf Energy for Petroleum Services (GEPS)** an Iraqi registered company, has been successfully operating in Iraq for the last few years.

**Gulf Energy for Petroleum Services (GEPS) is assigned from Nemsss on this project** and has submitted a commercial and a technical offer to IOTC on December 7th 2015.

GEPS was officially awarded the contract on February 1st, 2016.

GEPS has been in pre-mobilization mode for two months prior to the award, in preparation for the contract execution. Its staff has conducted preliminary meetings with Ministry of Oil (MOO) representatives, Port Authorities and various service providers. Meeting with IOTC employees, Dora refinery employees and Khor Al Zubair (KAZ) Port Authorities employees were conducted.

Processes and interactions with the Ministry of Oil have been clearly identified. The interaction with the IOTC and the Dora refinery as well as our relationship with the Dora Refinery have been analyzed.

## 1.2  Plan headlines

Following the signature of the contract, the execution was done according to these steps:

- Step 1: Coordinate allocated quantity and Payment with IOTC
- Step 2: Coordinate Payment with TBI
- Step 3: Coordinate Loading at the Refineries
- Step 4: Coordinate Land transport movements
- Step 5: Coordinate discharge of trucks and the port and loading into the vessel.



The details for each step is presented in the following pages of this document.

## 2  Operations with the Iraqi Oil Tanker Company

## 2.1  Presentation

The Iraqi Oil Tanker Company is a state owned Iraqi company specializing in the transport of crude oil and refined products. It was established in 1972. Its fleet of 24 tankers was destroyed in 1992. In 2007, IOTC purchased 4 oil tankers mainly used for the export of fuel oil. The fuel oil shipped is the IOTC allocation from the Ministry of Oil. IOTC puts on the market these allocations and contracts with local and foreign companies. These fuel oil contracts are the main activity of IOTC and the only way to guarantee a revenue stream.

## 2.2  Allocation and Payment Process

### 2.2.1  Process description using Dora Refinery as an example

1. IOTC Commercial department notifies GEPS of the Monthly available quantity and notifies GEPS to deposit down payment in USD at TBI Basra Branch
2. GEPS receives notification by email
3. GEPS transfers funds to TBI Basra IOTC Account
4. TBI Basra issues a transfer voucher Receipt  in the name of GEPS confirming receipt of funds and amount received
5. GEPS Basra Representative withdraws the Receipt ( ) from TBI Basra
6. GEPS Basra Representative delivers the Receipt ( ) to IOTC Financial Department
7. IOTC Financial Department acknowledges reception of Receipt ( )
8. IOTC Financial Department sends a memo ( ) to IOTC Commercial department confirming reception of funds
9. GEPS Basra Representative takes a copy of the memo ( ) to the IOTC Commercial department
10. IOTC Commercial department acknowledges reception of the IOTC Financial department Memo ( )
11. IOTC Commercial department sends a Memo ( ) to its distribution division requesting the issuance of Loading Orders for GEPS at the Dora Refinery
12. GEPS Basra Representative takes a copy of the Memo ( ).
13. IOTC Commercial department / distribution division sends the Loading Order ( ) to the Dora Refinery
14. GEPS Basra Representative takes a copy of the Loading Order ( ) or date and reference of the Loading Order and sends the information to GEPS Dora representative
15. GEPS Dora representative takes the lead and follows up with the Ministry of Oil distribution division.

**Payment Process triggers Loading process at the Refinery**

### 2.2.2   Process Chart



# 3  Operations at the Refinery

## 3.1  Presentation

The Dora refinery was built in 1953 and began operations in 1955. It is operated by Iraq's Midland Refineries Company (MRC). It is located 20 kilometers southwest of Baghdad. The Dora refinery is Iraq's second-largest.

GEPS did set up a team and premises at the Dora refinery which allowed a close follow up of all daily activities from quantity allocations coming from IOTC to trucks loading at the refinery.

### 3.1.1  Production and Storage figures

Dora refinery has produced an average of 10,000 MT a day for the past 6 months. Its average daily storage volume is approximately 30,000 MT.



Fuel Oil Dora
Refinery Daily Stocks

*(Source: MOO Daily Updates)*

### 3.1.2  Key people

**Refinery Entrance Gate agents (Refinery Police):** Regulates the entrance of trucks into the refinery based on security clearances.

**Information Desk agents:** Regulates the entrance of trucks in order of arrival.

**Safety Committee agents:** Controls the safety conditions of every truck and confirms they are suitable for loading.

**Dispatch department agents:** Issues the form that will allow the trucks to enter the refinery loading area.

**Operations department agents:** Stamps the form delivered by the Dispatch department and allowing the trucks to enter the refinery loading area.

**Loading agents:** In charge of the loading procedure

**Loading engineers:** In charge of controlling the loading quantity and filling in the quantity loaded in the loading voucher.

**Printing agents:** In charge of printing form 68 for each truck

**Operations/Oil Police:** In charge of issuing the daily security clearances (valid 72 hours) and determining the route for each truck. Note that the security clearance will be circulated in the Baghdad area. It is up to the Operations department to send the clearances to the Southern region operation department. Southern region will circulate the clearances in the South of Iraq.

## 3.2   Allocation Process

### 3.2.1   Process Description

1.  General Directorate for the distribution of petroleum products located in the Dora Refinery receives the IOTC Loading Orders      (■). He signs the GEPS Loading Order      (■) and request for action (*ijraa al lazim*).

2.  General Directorate for the distribution of petroleum products sends the approved Loading Order     (■) to the Dora Refinery Export Department.

3.  GEPS Dora representative obtains copy of approved Loading Order from General Directorate for the distribution of petroleum products     (■).

4.  GEPS Dora representative goes to the Refinery Export Department with the approved Loading Order     (■).

5.  Dora Refinery Export Department issues a Memo      (▤) confirming the loading orders are in order to the Dora Refinery Allocation department (dated and numbered) and allowing the loading of the trucks.

6.  Dora Refinery Export Department sends Memo     (▤) to the Dora Refinery Allocation department

7.  GEPS Dora representative takes of copy of this Memo     (▤) and heads to the Refinery Allocation department

8.  Dora Refinery Allocation department confirms the reception of the Refinery Export Department Memo     (▤) and authorizes the entrance of the trucks.

**3.2.2   Process Chart**

## 3.3  Loading Process

### 3.3.1  Process Description

1. On a daily basis, representatives of the land transport company provide GEPS staff and with a list detailed list containing of the trucks parked outside the refinery (Dijla Square) ready to load on the day.

   GEPS representatives collect the following vehicle information: tonnage, yearly certificate and driver identifications. They will deliver a receipt to each driver against these papers (⬛). Each receipt will include the follow information: driver's name, truck number, yearly certificate number, tonnage, and buyer.

2. GEPS representatives deliver the receipts (⬛) to the Refinery Allocation Department (Kism Al Kate3). The Refinery Allocation Department will issue an official receipt (⬛) for each truck have (2 copies). This receipt will contain the following information: driver's name, vehicle number, yearly certificate number, tonnage, and buyer.

3. GEPS representatives collect receipts (⬛) issued by the Refinery Allocation Department. Documents are submitted to Operations department. Operations Department stamps the receipts and authorize the trucks to enter the refinery.

4. GEPS representatives direct the truck drivers through the entrance gate and into the refinery.

5. GEPS representatives accompany the truck drivers and throughout the safety check lead by the safety committee. The purpose of the checks is to make sure trucks comply with safety regulations.

6. After the completion of the safety procedures, GEPS representatives accompany the truck drivers to their designated loading area inside the refinery. Loading areas are assigned by the Refinery Administration.

   Loading is done using hoses according to the number of slots available on each truck. Quantity loaded is motored with a meter. Quantity loaded is checked manually with a ruler to avoid theft (excess quantity loaded on trucks). Quantity is added to the receipt (⬛).

7. Once trucks are loaded and measured, GEPS representatives head to the Refinery Allocation Department (Kism Al Kate3) in order to obtain Form 68 (⬛) for each truck (form 68 is a manifest containing all the product and truck information (see appendix). It is printed in 5 carbon copy sets, one remaining at the refinery and 4 delivered to each driver)

8. GEPS representatives return to the Refinery Operations department with the receipts (⬛) and form 68 (⬛) in order to obtain the security clearances ( ) and route for each unvetted truck. Security clearances are delivered for a period of 72h whilst vetted trucks will be cleared for a month. The Dora Refinery operations department sends these clearances to the Oil Ministry South operation departments in order for them to circulate to the local authorities.

9. Once security clearances are released, GEPS representatives deliver the clearance number to the truck drivers along with Form 68 ( ). They will lead them out of the refinery and advise them to head to the discharge location.

### 3.3.2 Process Chart



### 3.3.3   Document samples

**Land Transport company Arrival Voucher**

**Refinery dispatch department
Loading Orders**

**Form 68**



# 4   Operations in Basra Port: Khor Al Zubair

## 4.1   Presentation

Khor Al Zubair port lies 45 km to the south of Basra city center and 105km from the north end of Arabian Gulf. It is the third port in Iraq, after Umm Qasr and the Basra Oil Terminal, measured by number of berth and tonnage handled annually. Constructed in 1971, KAZ was originally designed to export fertilizers and phosphates, and to import iron pellets for the State steel mill, not as an oil and gas port.



### 5.1.1   Port and terminals

KAZ Port is composed of 13 berths, numbered from 1 to 13.

### 5.1.2   Systems

KAZ Port authorities, in order to increase the revenue of the port, grants each company holding a contract, after the signature of the contract, to set up a system for the duration of the contract awarded by SOMO, MOE and IOTC.

Authorisation procedure as follows:
- KAZ Port Authority General Manager issues a memo allowing the company to set up a system on the berth of its choice.
- Memo is forwarded to the following entities for execution and follow up:
    o General Company for ports of Iraq (GCPI) General Manager
    o KAZ Port Authority Legal Department
    o KAZ Port Authority Operations Department
    o Navigation Department

Given that these contracts are limited in time (6 to 12 months), any investment made at the port will be held by the KAZ Port Authorities.

### 5.1.3   Notes

Berth#6 and Berth #7 where used by the company that was executing our same contract (Fuel Oil from Dora Refinery) in 2015.

A great number of loading and discharge operations are conducted simultaneously at berth#6 and berth#7 by different operators

## 5.2   Description of KAZ

Examples of pumping systems

*Pumping System of Berth #2*

(1) The first system located on the left side of berth#2 was initially set up for the loading Vacuum residue. It is was connected to a steam heating device.

System details:
1.   12 loading arms
2.   Connected to 3 pumps in good condition
3.   Loading rate: up to 280 MT/h in the summer and 60 to 100 MT/h in the winter
4.   Owned by Rouban Al Bahr Company and operated by Abu Saif




Fuel Oil (Bunker) loading system                     Steam Heating system




Steam Heating system                                 Gasoil discharge system

(2) Berth#2 also hosts a Gasoil discharge system not in use. Parts of this system where disassembled to complete the set-up of other systems.

### *Pumping System of Berth #3*

(3) Fuel Oil (bunker) loading system located at berth#3. This is a hydraulic based system.

System details:
1.    10 loading arms
2.    Loading rate: up to 220 MT/h in the summer and 60 MT/h in the winter
3.    Previously owned by Misk Al Tarik Company and operated by Captain Hazem



Fuel Oil loading system

*Pumping System of Berth #4*

(4) Fuel Oil (bunker) loading system with heating device

System details:
1. 10 loading arms
2. Connected to 3 pumps
3. Loading rate: up to 180 MT/h in the summer and 35 to 60 MT/h in the winter
4. Previously set up by KAT, it is used today by Uruk and operated by Ihab.



Fuel Oil loading system
KAT



Fuel Oil loading system
KAT

Fuel Oil heating System
KAT

Gasoil discharge system
Borj Al Maali





*Pumping Systems of Berth #6*

(I) uel oil (bunker) loading system located near berth#5

System details:
1. 6 loading arms
2. Connected to 3 pumps
3. Loading rate: up to 170 MT/h in the summer and 30 to 60 MT/h in the winter
4. Initially set up by Misk Al tarek for the loading of VR
5. Operated by Al Bateel Group and Mr. Firas (Abu Zayed).



Fuel Oil loading system (I)



Fuel Oil loading system (I)

(II) Naphtha discharge system

System details:
1. 6 loading arms
2. Connected to 2 pumps
3. Rate: up to 160 MT/h
4. Operated by Al Bateel Group



Naphtha discharge system (II)

(III) oil discharge system

System details:
1. Set up by Ranya
2. Never used

(URUK has been given the authorization to dismantle the system and set up their own system at this location)



Gasoil discharge system (III)
Ranya

(IV) VR / Fuel oil (bunker) loading system located in the center of berth#6

System details:
1. 10 loading arms
2. Connected to 3 pumps
3. Loading rate: up to 280 MT/h in the summer and 60 to 100 MT/h in the winter



Fuel Oil loading system (IV)
Ranya



Pumps located at lower level from the ground (IV)
Ranya

(V) Gasoil discharge system

System details:
1.  Set up by Joud Al Mokhtar
2.  not in use because of the draft restrictions



Joud Al Mokhtar (V)
Gasoil discharge system

(VI) Fuel oil (bunker) loading system located at the end of berth#6

Ali and Ali have been sponsored Sea Crown Marine Services to set up a Fuel Oil loading system. Sea Crown Marine Services has provided financial support to Ali and Ali and advanced part of the funds required in developing the system. According to the company representative, the system is ready.



Fuel Oil loading system (V)
Ali and Ali



Yokohama fenders (V)
Sea Crown Marine Services

*Pumping System of Berth #7*

Berth#7 is managed by KAZ Port Authorities. Only the Glencore and Toyota system is located on this berth.

The Joud Al Mokhtar Gasoil discharge system located in Berth#6 can be used on berth#7.

Loading systems located on the third part of berth#6 and on berth #7 can all be used when vessels have moored in berth #7. They can also be used for vessels mooring at the Marlok berth #8 when available.

## 6 Operations in Basra Port: Umm Qasr

### 6.1 Presentation

Umm Qasr Port lies 70km to the south of Basra city center. It is Iraq's only deep water port. It is also Iraq's second port in scale of size and goods shipped to the port of Basra. It is located on the western edge of the al-Faw peninsula and separated from the border of Kuwait by a small inlet. Prior to the Persian Gulf War, traffic between Kuwait and Iraq flowed over a bridge.



## 6.2   Description of UO berths

### 6.2.1   Berth#9

It appears that the Turkish vessel moored at berth#9 has not paid its port dues for a few years now. GCPI is studying options to increase revenue. Discussions have not yet been launched.

*Dimensions*

- Length = approx. 170 meters
- Width = approx. 34 meters
- Draft = approx. 8-9 meters

*Pumping Systems*

No systems available.

### 6.2.2   Sugar Port Berth#11

Al Abid Company is looking into a partnership with GEPS. Negotiations are in progress.

*Dimensions*

- Length = approx. 200 meters
- Width = approx. 250 meters
- Draft = approx. 9 meters

*Pumping Systems*

Gasoil Discharge System

At the present time, a Gasoil discharge system is located in Sugar Port berth. This system cannot be used for the loading of Fuel Oil. It could be used at a later stage for future Gasoil contracts with the Ministry of Oil or the Ministry of Electricity.



Gasoil discharge system

Fuel Oil loading system

Fuel Oil loading system is not available in Sugar Port terminal. GEPS will set up its own system.
Loading rates should be higher than KAZ as system will be closer to the vessel (no need to pump over 90 meters of hoses)

## 6.3   Pictures of UQ berths

### 6.3.1   Berth#9

Berth#9 is located in the South part of Umm Qasr Port.

*Location*



### 6.3.2   Sugar Port Berth#11

Sugar Port berth#11 is located in the North part of Umm Qasr Port.

*Location*







Gasoil discharge system



Platform



Entrance Gate



Entrance Gate

# 7  Appendix

## 7.1  Dora Refinery Receipts and Vouchers

### 7.1.1  Land Transport company Arrival Voucher



### 7.1.2  Refinery dispatch department Loading Orders



### 7.1.3   Form 68



## 7.2   Basra Canal and Berths locations



## 7.3   Pumping Systems in Khor Al Zubair: Pictures

### 7.3.1   Steam heating system



### 7.3.2   Rouban Al Bahr Company Fuel Oil loading system



### 7.3.3   Burj Al Maali Gasoil discharge system



### 7.3.4   Gasoil discharge system



### 7.3.5 Uruk Fuel Oil loading system





### 7.3.6   Uruk Fuel Oil loading system including heating system





### 7.3.7   VR and Fuel Oil loading system





### 7.3.8   Naphtha and Gasoil discharge system





### 7.3.9   Ranya Fuel Oil loading system





### 7.3.10   Gasoil discharge system



### 7.3.11   Joud Al Mokhtar Gasoil discharge system



### 7.3.12 SCMS Fuel Oil loading system











### 7.3.13  SCMS Fenders



### 7.3.14 I.O.T.C. Premises



**Dora Fuel Oil Specifications**

**Republic of Iraq**
Ministry of Oil
**Technical Directorate**

وزارة النفط
الدائرة الفنية

Ref.:
Date:

العدد : ف٤ / ١٥٥ / ٧٥٠
التاريخ : ١١ / ١١ /٢٠١٥

شـركة نـاقـلات النفط العراقية

م/ مواصفة منتوج زيت الوقود

أشارة الى كتابكم العدد ٧٥٤٢ في ٢٠١٥/١١/٩ .

نرافـق لكـم مواصـفات منتـوج زيـت الوقـود المنـتج مـن مصـفى الـدورة وكمـا مبـين في الجدول ادناه .

| Item | Test | | Specifications |
|------|------|------|----------------|
| 1 | Density @ 15 C° g/cm$^3$ | | 0.98 |
| 2 | Sulfur Content wt% | Max | 5 |
| 3 | Flash point C° | Min | 100 |
| 4 | Viscosity Cst @ 50 C° | Max | 500 |
| 5 | Pour Point C° | Max | +9 |
| 6 | Carbon Residue wt% | Max | 9.5 |

*مواصفة الكثافة استرشادية وليست حاكمة.

للتفضل بالاطــلاع ... مــــع التقـديــــر.

ضـيـاء كـمـر صفـر
المـديـر الـــعــام
٢٠١٥/١١/ .

ة منه الى /

مكتب السيد الوكيل لشؤون التصفية / للتفضل بالاطلاع ... مع التقدير.
شركة مصافي الوسط / اشارة الى المداولة الهاتفية مع السيد مدير قسم المختبرات والسيطرة النوعية ... مع التقدير.
قسم التقييس والسيطرة النوعية / للمتابعة لطفاً .
رة ١١/١٠



REPUBLIC OF IRAQ
MINISTRY OF OIL
IRAQI OIL TANKERS
COMPANY (IOTC)

REF :
DATE :

جمهورية العراق
وزارة النفط
شركة ناقلات النفط العراقية
( أيوتك – شركة عامة )

شركة الخليج للطاقة المحدودة
EMAIL: INFO@GULF-ENERGY.ME

العدد : ٨١٩ / ١١ / ٢٠١٦
التاريخ : ٢٠١٦ / ١١ / ٢٠

الموضوع / مناقصة رقم ( ٢ / ١٠٧ )

[النص العربي للوثيقة - غير واضح بسبب دوران الصفحة وجودة المسح]



E-mail : iotc_basrah@yahoo.com
E-mail : info@iotc-basra.com
TEL.: 314909 - 314907
FAX : 313346 - 318426
P.O.box : 137

N. 719
Date: 28/1/2016

To: Gulf Energy for Petroleum Services
Managing Director Mr. Wadoud Izzat Mohamed
Address: Iraq, Baghdad, alkarrada-m, 901 bldg, 27ch/42
Email: info@gulf-energy.me
Phone: 07901174931 / 07715447428

Based on the recommendations of the Minutes of the Committee of study and analysis of the internal tenders, the Authentication of the Central Committee to review the contracts and the Central Tenders, and the Minister's approval as per the powers given to him,  it has been decided to award you the tender numbered (3/2015) related to the sale and transport of fuel oil from Dawra refinery to the Persian Gulf ports within the listed allocations (the operating budget / referral stage / commercial activity of the company) as per the tender's conditions and which is considered an integral part of the Letter of transmittal and as per the price submitted by yourselves (**55.75USD**) per ton which is the amount of discount your company will deduct from the price of the sale per ton, taking into consideration the additional discounts when there is neutralization taking place in the sulfur content of the fuel oil and the degree of viscosity and flash point as detailed in the tender documents and a rate (determined by our company) and for a period of one year.

We ask your presence in a period of 14 days latest from the date you received the award letter to sign the contract related to the above tender (as long as there is no legal objection), bringing with you the documents and identification records listed below. Otherwise, your company shall bear all legal consequences and you will be considered as abstinent and the work will be done on your expenses and you will be charged for the difference in allowances.

1- Identification documents of the Managing Director or the authorized person through a legalized authorization (Identity of the Civil Status, Civil Status Certificate, housing card, block book to the ration card, tax settling accounts, proof of residence supported by the Municipal Council and company's address legalized by the province).
2- Good performance bond (5%) from the proposal value in the form of a letter of guarantee issued by a certified bank before the contract signature. The guarantee should be effective until the end of the contract period and the final liquidation accounts and, subject to renewal if there is a need for renewal.
3- Payment fees of the stamp costing 720.000USD seven hundred and twenty thousand US dollars before signing the contract in the form of a certified check and a Juridical fee of 10.000ID ten thousand dinars and any other fees.

Hussein Allawi Abd Ali
General manager/ procuration
Chairman

**From:** Ian Thompson [mailto:it@amiraindustries.ch]
**Sent:** jeudi 7 avril 2016 14:18
**To:** MEREI Hanna
**Subject:** Fwd: Our Meeting This Morning

Dear Hanna

Sorry I didn't have your contact details before I sent the below but I do now so all good

Nice to me you earlier

Kind Regards

Ian

Mobile +44 7552 277527

Sent from my iPad
Begin forwarded message:

> **From:** <it@amiraindustries.ch>
**Date:** 7 April 2016 at 14:04:21 CEST
**To:** Doron Rolnik <doron.rolnik@gunvortrade.ch>, Torbjorn Tornqvist <torbjorn.tornqvist@gunvortrade.ch>, <milos.spasic@gunvortrade.ch>, <lars-erik.wand@gunvortrade.ch>
**Cc:** Jean Jacques Bovay <jjbovay@gmail.com>, Alain Bionda <ab@bl-lawfirm.ch>, Lawrence Kayablian <lk@amiraindustries.ch>, Mr Arman Kayablian <ak@amiraindustries.ch>, Neil Passmore <njp@hannamandpartners.com>
**Subject:** **Our Meeting This Morning**

Dear All

Thank you for your time this morning

As a quick recap of what we agreed in our meeting please review the following:

A 3 million USD advance credit facility payable immediately against a proforma invoice to NEMSSS account and to be maintained at a minimum of 3 million USD to facilitate the purchasing of FO from IOTC - the USD amount will increase based on NEMSSS requirement to lift more Fuel Oil from IOTC which is in line with the JV goal of lifting more Fuel Oil from IOTC

Once the 50/50 JV has been established within 30 days a joint account with authorised signatories from both sides of the JV will be created to facilitate payment for FO and to grow the business together going forward

Please confirm your acceptance of these minutes and I look forward to receiving your comments on this and what you need from NEMSSS administratively

We are looking forward to working successfully and profitably together over the long term on a joint venture basis

Doron looking forward to seeing you in 1 hours time to discuss shipping logistics

Kind Regards

Ian

Mobile +44 7552 277527

Sent from my iPhone

**From:** Mohamed El Ammawy [mailto:mea@amiraindustries.ch]
**Sent:** 08 April 2016 16:06
**To:** Ian Thompson; ROLNIK Doron; Lawrence Kayablian; Arman Kayablian
**Subject:** RE: IOTC/GEPC Contract Translation - Draft

Dear All,

Kindly find attached the GEPS/NEMSSS contract.

Best Regards,

Mohamed A. El Ammawy
VP Business Development



Amira Management B.V.
Marfaa' 127 Bldg - Foch Street
Postal Code 2012 6607
Downtown Beirut
Lebanon
T +961 1 985 308
F +961 1 985 309
M +961 76 741 222 (Lebanese)

**From:** Ian Thompson
**Sent:** Friday, April 8, 2016 4:41 PM
**To:** ROLNIK Doron ; Lawrence Kayablian ; Arman Kayablian
**Cc:** Mohamed El Ammawy
**Subject:** Fw: IOTC/GEPC Contract Translation - Draft

Dear Doron

Please find attached English translation of IOTC/GEPS contract

Lawrence/Mohammed as per Doron's request from this morning please could you send over to him the GEPS/NEMSSS documents such as they are

Warmest Regards

Ian

Sent from my BlackBerry 10 smartphone.

**FINAL SALE CONTRACT**

**DATE: 29.02.2016**

**1. SELLER:**    **GULF ENERGY FOR PETROLEUM SERVICES**
**BLDG 901 – 27TH STREET 42**
**AL KARADA – BAGHDAD**
**STATE OF IRAQ**
**DULY REPRESENTED BY: MUSTAPHA HASHIM LAZIM**
**PURSUANT TO THE SALE AND TRANSPORT CONTRACT**
**ENTERED BETWEEN GULF ENERGY FOR OIL SERVICES LLC**
**AND IRAQ OIL TRANSPORT COMPANY (IOTC) DATED 15TH**
**FEBRUARY 2016 NUMBER 4 (THE "IOTC CONTRACT")**

**2. BUYER:**    **NEMSSS PETROLEUM INC. (BVI)**
**REGISTRATION # 1893585**
**ROAD TOWN - TORTOLA**
**BRITISH VIRGIN ISLANDS**
**DULY REPRESENTED BY: ARMAN KAYABLIAN**

**3. CONTRACTUAL PERIOD:**

MARCH 1ST, 2016 – FEBRUARY 28, 2017

**4. PRODUCT**

STRAIGHT RUN FUEL OIL OF IRAQI ORIGIN, EX DORA REFINERY, (OR OTHER REFINERY, BY MUTUAL AGREEMENT), WITH TYPICAL SPECIFICATIONS AS PER APPENDIX (A), AND FOLLOWING GUARANTEES:

- DENSITY AT 15 DEG C – G/CM3       0.980 MAX
- SULPHUR CONTENT PCT WT             5.0  MAX
- FLASH POINT DEG C (PM)             100  MAX
- VISC AT 50 DEG C (CST)             500  MAX
- POUR POINT DEG C                   +9   MAX
- CARBON RESIDUE PCT WT              9.5  MAX

PRODUCT SHOULD BE FREE OF WASTE OIL, LUBRICANTS, ETC.

**5. QUANTITY**
720,000 TO 1,440,000 NET METRIC TONS IN SELLER'S OPTION PER YEAR, IN MONTHLY QUANTITIES OF 60'000 MT TO 120,000 MT. SEVERAL SHIPMENT LOTS FOR EACH MONTH.

**6. DELIVERY**
IN ONE OR SEVERAL MONTHLY SHIPMENT LOTS, FREE ON BOARD (FOB) ONE SAFE PORT/ONE SAFE BERTH KHOR AL ZUBAIR OR UMM QASR, INTO BUYER'S

NOMINATED VESSELS TBN, TO BE ACCEPTABLE TO SELLER (SUCH ACCEPTANCE NOT TO BE UNREASONABLY WITHHELD).

BUYER MAY SUBSTITUTE ANY NOMINATED VESSEL WITH ANOTHER VESSEL.

### 7. DETERMINATION OF QUANTITY/QUALITY

THE QUANTITY AND QUALITY TO BE ASCERTAINED BY A MUTUALLY AGREED, INTERNATIONAL INDEPENDENT INSPECTOR AT LOAD PORT, WHOSE FINDINGS SHALL BE FINAL AND BINDING ON BOTH PARTIES, EXCEPT IN CASE OF MANIFEST ERROR OR FRAUD.

THE QUALITY SHALL BE BASED ON SHIP'S COMPOSITE SAMPLE AFTER LOADING. THE QUANTITY SHALL BE BASED ON SHIPS FIGURES AFTER LOADING.

### 8. PURCHASE PRICE:

PURCHASE PRICE:
FOR EACH SHIPMENT, PRICE SHALL BE CALCULATED AS FOLLOWS: IN US DOLLARS PER NET METRIC TON IN AIR, ON BILL OF LADING QUANTITY FOB KHOR AL ZUBAIR OR FOB UMM QASR, SHALL BE THE AVERAGE OF A) AND B) BELOW LESS A DISCOUNT OF C) WHERE

A =     MEAN QUOTATION FOR "HSFO 180 CST" AS PUBLISHED BY PLATTS ASIA-PACIFIC/ARAB GULF MARKETSCAN UNDER HEADING "FOB ARAB GULF"

B =     MEAN QUOTATION FOR "IFO 180 CST / FUJAIRAH" AS PUBLISHED BY PLATT BUNKERWIRE UNDER HEADING "ARAB GULF"

C =     USD 40.25 / NET MT

PRICING WILL BE THE AVERAGE OF THE MONTH OF DISPATCH FROM LOADING REFINERY (TRUCKWAY BILL DATE).

ADVANCE PAYMENT
FOR EACH BATCH, THE SELLER SHALL ISSUE AND THE BUYER SHALL MAKE PAYMENT AGAINST A PROVISIONAL INVOICE.

PROVISIONAL PAYMENT PRICING WILL BE BASED ON THE PREVIOUS MONTH AVERAGE OF A) AND B) BELOW AND ROUNDED AS PER IOTC OFFICIAL PRICING LESS A DISCOUNT OF C) WHERE

A =     MEAN QUOTATION FOR "HSFO 180 CST" AS PUBLISHED BY PLATTS ASIA-PACIFIC/ARAB GULF MARKETSCAN UNDER HEADING "FOB ARAB GULF"

B =     MEAN QUOTATION FOR "IFO 180 CST / FUJAIRAH" AS PUBLISHED BY PLATT BUNKERWIRE UNDER HEADING "ARAB GULF"

C =     USD 40.25 / NET MT

**9. TERMS OF PAYMENT:**

A/ PROVISIONAL INVOICE WILL BE ISSUED FOR EVERY BATCH LOADED (MINIMUM BATCH SIZE 4'000 MT) AGAINST PRESENTATION OF THE BILL OF LADING.

PAYMENTS SHALL BE MADE BY BUYER TO SELLER IN UNITED STATES DOLLARS, NO LATER THAN 3 WORKING DAYS AFTER RECEPTION OF PROVISIONAL INVOICE AND BILL OF LADING.

B/ INVOICE WILL BE ISSUED FIRST WEEK OF EACH MONTH. PROVISIONAL PAYMENT WILL BE DEDUCTED FROM THE FINAL INVOICE.

ANY BALANCE DUE BY THE BUYER TO THE SELLER OR ANY REFUND DUE BY THE SELLER TO THE BUYER (AS THE CASE MAY BE) SHALL BE MADE IN UNITED STATES DOLLARS, NO LATER THAN 3 WORKING DAYS AFTER RECEIPT OF FINAL INVOICE AND BILL OF LADING.

**9. PROFIT AND LOSS SHARING**

THE PARTIES AGREE TO SHARE THE NET PROFIT OR THE NET LOSS GENERATED AND/OR INCURRED IN CONNECTION WITH EACH SHIPMENT LOT ON THE FOLLOWING BASIS:

BUYER: 50 %
SELLER: 50 %

THE NET PROFIT OR NET LOSS WILL BE CALCULATED ON THE BASIS OF THE DIFFERENCE BETWEEN:

a. THE PURCHASE PRICE OF THE SHIPMENT LOT UNDER THE IOTC CONTRACT; AND,
b. THE GROSS ON-SALE PRICE OF EACH SHIPMENT LOT SOLD BY NEMSSS TO THE ULTIMATE BUYER PLUS OR MINUS THE ASSOCIATED COSTS AND/OR EXPENSES, INCURRED AND DETERMINED BY NEMSSS.

**9. RECONCILIATION AND SETTLEMENT OF PROFIT AND LOSSES**
THE PARTIES AGREE THAT THE NET PROFIT OR NET LOSS WILL BE CALCULATED, RECONCILED, AGREED AND APPORTIONED BETWEEN THE PARTIES ON A 50% (BUYER) AND 50% (SELLER) BASIS WITHIN 75 DAYS FROM THE RECEIPT OF THE FINAL INVOICE.

THE PARTIES AGREE THAT WITHIN 75 DAYS OF THE DELIVERY OF THE FINAL SHIPMENT LOT UNDER THIS AGREEMENT THE PARTIES SHALL MEET AND EXCHANGE EACH PARTY'S CALCULATION, RECONCILIATION AND APPORTIONMENT OF THE OVERALL NET PROFIT OR NET LOSS.

## 11. TITLE AND RISK

RISK IN THE PRODUCT DELIVERED UNDER THIS CONTRACT AND THE TITLE THERETO SHALL PASS FROM SELLER TO BUYER AS THE PRODUCT PASSES THE VESSEL'S PERMANENT FLANGE AT LOADPORT.

## 12. ASSIGNMENT

WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER PARTY, WHICH CONSENT SHALL NOT BE UNREASONABLY WITHHELD, NEITHER PARTY MAY ASSIGN ITS RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT IN FULL OR IN PART, EXCEPT THAT THE BUYER AND ITS ASSIGNS MAY WITHOUT SUCH CONSENT ASSIGN ALL OR A PORTION OF THEIR RIGHTS TO RECEIVE AND OBTAIN PAYMENT UNDER THE CONTRACT IN CONNECTION WITH SECURITISATION OR BANK FUNDING ARRANGEMENTS. ANY SUCH ASSIGNMENT WILL NOT DETRACT FROM THE BUYER'S OBLIGATIONS UNDER THIS CONTRACT.

## 13. FORCE MAJEURE

NEITHER BUYER NOR SELLER WILL BE LIABLE FOR DAMAGES OR OTHERWISE FOR ANY FAILURE OR DELAY IN PERFORMANCE OF ANY OBLIGATION HEREUNDER OTHER THAN ANY OBLIGATION TO MAKE PAYMENT, WHERE SUCH FAILURE OR DELAY IS CAUSED BY FORCE MAJEURE, BEING ANY EVENT OR OCCURRENCE OR CIRCUMSTANCE REASONABLY BEYOND THE CONTROL OF THAT PARTY, INCLUDING BUT WITHOUT PREJUDICE TO THE GENERALITY OF THE FOREGOING, FAILURE OR DELAY CAUSED BY OR RESULTING FROM ACTS OF GOD, STRIKES, FIRES, FLOODS, WARS, (WHETHER DECLARED OR UNDECLARED), RIOTS, DESTRUCTION OF THE PRODUCT, PERILS OF THE SEA, EMBARGOES, ACCIDENTS, RESTRICTIONS IMPOSED BY ANY GOVERNMENT AUTHORITY OR PERSON PURPORTING TO ACT THEREFORE. THE PARTY WHOSE PERFORMANCE IS AFFECTED SHALL NOTIFY THE OTHER PARTY HERETO INDICATING THE NATURE OF SUCH CAUSE. TO THE EXTENT POSSIBLE, THE AFFECTED PARTY SHALL INFORM THE OTHER PARTY OF THE EXPECTED DURATION OF THE FORCE MAJEURE EVENT.

THE TIME FOR THE SELLER OR BUYER TO PERFORM THEIR RESPECTIVE OBLIGATIONS UNDER THE CONTRACT (OTHER THAN THE OBLIGATION TO PAY WHEN DUE ALL AMOUNTS THAT ARE OWED TO THE OTHER WHICH SHALL NOT BE SUSPENDED) SHALL BE EXTENDED DURING ANY PERIOD DURING WHICH THESE OBLIGATIONS ARE PREVENTED, HINDERED, CURTAILED OR DELAYED BY REASON OF ANY FORCE MAJEURE EVENT UP TO A PERIOD OF 30 CONSECUTIVE DAYS. IF ANY OF THESE OBLIGATIONS SHALL BE PREVENTED, HINDERED, CURTAILED OR DELAYED FOR MORE THAN 30 DAYS, EITHER PARTY MAY TERMINATE THIS CONTRACT WITH RESPECT TO SUCH DELIVERY UPON WRITTEN NOTICE TO THE OTHER PARTY.

## 14. ENTIRE AGREEMENT

THE CONTRACT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND SUPERSEDES ALL PREVIOUS NEGOTIATIONS, REPRESENTATIONS, AGREEMENTS OR COMMITMENTS WITH REGARD TO ITS SUBJECT MATTER.

EACH PARTY ACKNOWLEDGES THAT IN ENTERING INTO THIS CONTRACT IT HAS NOT RELIED ON ANY REPRESENTATIONS, WARRANTIES, STATEMENTS OR UNDERTAKINGS EXCEPT THOSE WHICH ARE EXPRESSLY SET OUT HEREIN.

EACH PARTY FURTHER ACKNOWLEDGES THAT IT WILL ONLY BE ENTITLED TO REMEDIES IN RESPECT OF BREACH OF THE EXPRESS TERMS OF THE CONTRACT AND WILL NOT BE LIABLE IN TORT OR UNDER ANY COLLATERAL CONTRACT OR WARRANTY IN RESPECT OF ANY REPRESENTATIONS, WARRANTIES, STATEMENTS OR UNDERTAKINGS WHICH MAY HAVE BEEN MADE PRIOR TO THE CONTRACT BEING ENTERED INTO.

**15. LAW & JURISDICTION**
THIS CONTRACT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW.  ANY CONTROVERSY, DISPUTE OR CLAIM WHATSOEVER ARISING OUT OF OR IN CONNECTION WITH THIS CONTRACT OR THE BREACH THEREOF SHALL BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE HIGH COURT OF JUSTICE IN LONDON; FOR THE AVOIDANCE OF DOUBT THIS WILL NOT PREVENT EITHER PARTY FROM TAKING PROCEEDINGS IN ANY OTHER JURISDICTION TO OBTAIN SECURITY OR ANCILLARY RELIEF OR TO ENFORCE ANY ORDER OR JUDGEMENT.

**FOR AND ON BEHALF OF**
**GULF ENERGY FOR PETROLEUM SERVICES**

**NAME: MUSTAPHA HASHIM LAZIM**
**TITLE: GENERAL MANAGER**
**EMAIL ADDRESS: MUSTAPHA@GULF-ENERGY.ME**

**FOR AND ON BEHALF OF**
**NEMSSS PETROLEUM INC.**

**NAME: ARMAN KAYABLIAN**
**TITLE: CHIEF OPERATIONS MANAGER**
**EMAIL ADDRESS: NEMSSS@NEMSSS.COM**

5

**From:** Ian Thompson [mailto:it@amiraindustries.ch]
**Sent:** 08 April 2016 12:41
To: ROLNIK Doron
Cc: Lawrence Kayablian; Arman Kayablian
Subject: IOTC/GEPS Contract Arabic

Dear Doron
As requested here is the Arabic version of the IOTC/GEPS original contract - English translation to follow
Also the Nassiriyah Refinery Award letter also in Arabic - English translation to follow also
WR
Ian
Mobile +44 7552 277527


Sent from my iPhone

العدد : ٤

التاريخ : ٢٠١٦/٤/١٥

## م/ عقد بيع ونقل كميات زيت الوقود ( البنكر )
## من مصفى الدورة

الطرف الأول /  المدير العام لشركة ناقلات النفط العراقية / إضافة لوظيفته

العنوان الكامل : العراق – البصرة

هاتف : ٣١٣٣٤٨ – ٣١١١١٥ ( ٠٠٩٦٤ )

البريد الالكتروني:iotc–basrah@yahoo.com

الطرف الثاني/ شركة طاقة الخليج للخدمات النفطية / محدودة المسؤولية

العنوان الكامل: بغداد / الكرادة  محلة / ٩٠١ بناية / ٢٧ / ش – ٤٢

البريد الكتروني -: email : info @gulf – energy .me

هاتف -: ٠٧٩٠١١٧٤٩٣١ / ٠٧٧١٥٤٤٧٤٢٨

اتفق الطرفان على ما يلي :-

### البند الأول / موضوع العقد :

بيع الكميات المخصصة لشركة ناقلات النفط العراقية من مادة زيت الوقود (بنكر) مقدارهــا ( ٦٠٠٠٠ – ١٢٠٠٠٠ ) من ستون ألف الى مائة وعشرون الف  طن / شهريا قابلة للزيادة والنقصان وحسب مـا متوفر في المصفى محـملة من مصفى (الـدورة) واصلة الى مواني الخليج العربي .

### البند الثاني / الفترة العقدية :

١- الفترة العقدية لمدة سنة واحدة قابلة للتمديد والتجديد باتفاق الطرفين وتكون سارية المفعول من تاريخ المباشرة بالعمل على ان لاتتجاوز المباشرة بالعمل فترة ( ١٥ ) من تاريخ توقيع العقد من قبل الطرف الاول .

٢- تضاف فترات التوقف بالتحميل بسبب المصفى او الظروف الطارئة او القوة القاهرة الى الفترة التعاقدية .

### البند الثالث / المواصفات :

١- تكون المواصفات للزيت الوقود البنكر المحمل من المصفى المذكور اعلاه  وفقا'' لما يلي :

| Item | Test | Result | Specifications |
|------|------|--------|----------------|
| 1 | Density @ 15.0 C°g/cm3 | 0.98 | Max |
| 2 | Sulfur  content  wt% | 5 | Max |
| 3 | Flash point  C° (P.m) | 100 | Max |
| 4 | Viscosity@ 50 C°  ( CST ) | 500 | Max |
| 5 | Pour point  (C°) | +9 | Max |
| | Carbon  residue ( wt% ) | 9.5 | Max |

TAQA = GULF ENERGY

٢- تعتمد الكميات المثبتة ( بالطن المتري ) على مستندات شحن السيارات الحوضية او المثبته في الموقف الرسمي اليومي للتحميل الصادر من قبل المصفى عند اجراء الحسابات بين الطرفين ولا يحق للطرف الثاني الاعتراض عليها بعد التحميل والتوقيع على مستندات الشحن .

**البند الرابع/ آلية الدفع:**

أ- في حالة الدفع نقدا :- يلتزم الطرف الثاني بدفع قيمة الكمية الشهرية المحملة نقدا وقبل البدء بالتحميل وبالسعر التخميني على إن تعزز تلك القيمة ويتم إيداع المبلغ في حساب شركتنا في المصرف العراقي للتجارة / بصرة دولار ومن ثم تتم تسوية الحسابات شهريا مع تحمله كافة العمولات المصرفية على إن تكون الكميات المطلقه للتحميل على شكل دفعات ( وبما يتناسب مع الطاقة التحميلية للمصفى ) وبما لايتجاوز الحد الأقصى المثبت في العقد وحسب المبالغ المودعة من قبل الشركة أعلاه .

ب- يتحمل الطرف الثاني ما يلي :

١- أجور النقل البري بواسطة الصهاريج
٢- كافة العمولات المصرفية.
٣- رسوم دخول السيارات الى الرصيف ومبلغ استئجار رصيف التفريغ .
٤- رسوم الكمارك والفرق بين الكميات المحملة والمفرغة أن وجد .
٥- رسوم الوكالات البحرية .
٦- جميع الرسوم والأجور والعوائد المترتبة على رسو وتحميل وإبحار الناقلة .
٧- رسم الطابع ونشر الإعلان قبل توقيع العقد .
٨- إي رسوم أخرى من الجهات ذات العلاقة .

**البند الخامس / سعر البيع :-**

١- يكون سعر البيع واصل الى موانئ الخليج العربي وفقا" للمعادلة التالية :

$$\text{سعر البيع} = \frac{\text{المعدل الشهري للنشرة بلاتس العالمية CST١٨٠ + المعدل الشهري للنشرة بنكر وابر CST ١٨٠ ( الفجيرة )}}{٢}$$

٢- يطرح من سعر البيع مبلغ قدره ( ٣٥,٧٥ ) دولار / طن خمسة وثلاثون دولار وخمسة وسبعون سنت للطن الواحد والذي يمثل أجور النقل البري وكافة الرسوم الواردة في ( البند الرابع / ب ) ويطرح منه كذلك مبلغ ( ٢٠ ) دولار / طن عشرون دولار للطن الذي يمثل اجور النقل البحري في حالة تعذر النقل بواسطة ناقلات شركتنا .

٣- يكون النقل البحري بواسطة الناقلات المملوكة لشركتنا وان تعذر ذلك يقوم الطرف الثاني بالنقل البحري مقابل مبلغ ( ٢٠ ) دولار / طن أجرة نقل الطن ويطرح هذا المبلغ من سعر البيع النهائي ويحق لشركتنا الاختيار بين النقل على ناقلاتها او على الناقلات التي يجلبها الطرف الثاني ويتحمل الطرف الثاني جميع المصاريف المترتبة على الناقلة اذا تم النقل من قبلهم .

TAQA = GULF ENERGY

٤ - يقوم الطرف الثاني بعملية النقل البري بواسطة السيارات الحوضية (الصهاريج ) من مصفى الدورة الى الناقلة الرئيسية على ارصفة ميناء خور الزبير او اي رصيف اخر للتحميل يتم تهيئته من قبله ويتحمل كافة الرسوم والاجور المترتبة على هذه العملية على ان تتوفر في هذه السيارات كافة الشروط الفنية والرسمية وعلى الطرف الثاني تقديم قوائم بتلك السيارات واسماء السائقين ومساعديهم ان وجدوا ليتم اعتمادها من قبلنا ومن قبل المصفى .

٥ - يمنح فرق للطرف الثاني ( دولار واحد لكل طن عن كل مرتبة عشرية ) لمعالجة الحيد الحاصل في المحتوى الكبريتي لزيت الوقود لما زاد عن ( ٠.٥٠ ٣ % وزنا ) وفقا" للمعادلة التالية :

$$0.02894 \times (x + 0.1691) = مقدار الفرق في نتيجة الفحص بين مختبرين (( حيث ( X ) تمثل نسبة المحتوى الكبريتي الفعلية في المنتوج )).$$

٦ - يمنح فرق للطرف الثاني عن الحيد في درجة اللزوجة فوق (١٨٠cst) حسب المعادلة التالية :-

$$\frac{معدل السعر الاسبوعي لزيت الوقود ١٨٠cst - المعدل الاسبوعي لزيت الوقود ٣٨٠cst}{٢٠٠} = الفرق في السعر$$

قيمة الفرق في الفحص بين المختبرين = اللزوجة الفعلية $x ٠.٠٧٤$
معدل السعر الأسبوعي زيت الوقود ١٨٠ - الفرق في السعر = السعر الاسبوعي الجديد المقرر للزوجة اكثر من ١٨٠. CST .

٧ - يمنح فرق للمشتري عن درجة الوميض حسب المعادلة التاليه التي اقل من (٦٠) درجة:
فرق درجة الوميض عن (٦٠) درجة $X ٠.٤ %X$ القيمة الكلية للشحنة (دولار) ٠

٨ - يحدد السعر النهائي للبيع وفقا" لما يلي :
سعر البيع المذكور في الفقره (١) مطروحا" منه ( ٥٥.٧٥ + فروقات المواصفات الفنية الواردة في الفقرات ٥، ٦، ٧ ) .

<u>البند السادس /الغرامات التأخيرية :-</u>

يتحمل الطرف الثاني غرامة تاخيرية عن أيام التأخير في تنفيذ التزاماته التعاقدية وفقا للمعادلة :-

مبلغ العقد الأصلي +- إي تغير في المبلغ (التغيرات التي تصاحب صعود أو نزول الأسعار العالمية )

_____ × ( ٢٥ ) % = مقدار غرامة اليوم الواحد

مدة العقد الكلية ( مدة العقد الأصلية +- اي تغير في المدة





٣

البند السابع / كفالة حسن الأداء والتأمينات :

١- يودع الطرف الثاني في حساب الطرف الأول مبلغ قدره ( ٥% ) من مبلغ العقد الكلي على شكل خطاب ضمان حسن تنفيذ لمدة سنة قبل توقيع العقد .

٢- يتم مصادرة كفالة حسن التنفيذ بالكامل أذا كانت نسبة التحميل اقل من ٢٥ % .

٣- يحق للطرف الأول استقطاع الغرامات والمبالغ التي تترتب بذمة الطرف الثاني من مبلغ كفالة حسن الأداء على ان يتم تسديد ما يتم استقطاعه من مبلغ الكفالة إثناء تنفيذ العقد فور إبلاغه من قبل الطرف الأول .

٤- يحق للطرف الأول في اي وقت أثناء سريان العقد نقصان او زيادة الكميات دون ان يترتب عليه اي مسؤولية او التزام نتيجة ذلك وللطرف الأول كذلك تغيير مواقع التحميل حسب الحاجة وظروف العمل .

٥- لا يحق للطرف الثاني المطالبة بالمبالغ المصادرة او إقامة دعوى بصددها .

٦- في حالة أخلال الطرف الثاني بتنفيذ بنود العقد يتم مصادرة كفالة حسن الأداء مع تحملهم فرق البدلين نتيجة لاخلالهم بالتزاماتها بعد البدء بتنفيذ العقد والبيع بسعر اقل من السعر المفترض نتيجة للتأخر في تنفيذ بنود العقد الذي ادى بالنتيجة الى التأخر في عملية البيع .

٧- في حال منح الطرف الثاني كمية إضافية او زيادة الأسعار لمعدل نشرة بلاتس يتم تغطية هذه الكمية بكفالة حسن تنفيذ البالغة ٥% من القيمة التقديرية من الكمية الإضافية .

٨- في أي حال من الأحوال لا يتم تصفية العقد وإعادة المبالغ المتبقية من الإيداعات او كفالة حسن التنفيذ الا بعد ورود كتاب من الهيئة العامة للضرائب يؤيد فيه براءة ذمة الطرف الثاني وإطلاق المستحقات خلال فترة ( ٣٠ ) يوم من تاريخ إبلاغه من قبل الطرف الأول وبخلافه يتم تطبيق تعليمات التحاسب الضريبي وفقا" لقوانين العراقية النفاذة للعقود المبرمة بين جهات التعاقد العراقية والأجنبية وأي تعليمات أخرى تصدر بخصوص . وبعد جلب براءة الذمة من دائرة التقاعد والضمان الاجتماعي .

٩- لا يتحمل الطرف الأول مسؤولية الفترة الزمنية التي تستغرقها الهيئة العامة للضرائب في إكمال إجراءاتها اللازمة لتزويد الطرف الثاني ببراءة الذمة وعلى الطرف الثاني ان يلتزم بتمديد فترة خطاب الضمان .

البند الثامن / القوة القاهرة

١- يعفى طرفا العقد من مسؤولية ( الإخفاق / نقص في الكميات المجهزة / التأخير ) اذا كان ذلك بسبب القوة القاهرة استنادا لقواعد واحكام القانون العراقي .

٢- اذا تجاوزت فترة التأخير بسبب القوة القاهرة مدة الثلاثة اشهر فيحق لاي من الطرفين فسخ العقد بعد اشعار الطرف الأخر خطياً .

البند التاسع / تسوية النزاعات

تتم تسوية الخلافات والنزاعات التي يمكن ان تحدث جراء تنفيذ هذا العقد بصورة رضائية من خلال التفاوض بين ممثلي الطرفين المتعاقدين وفي حالة عدم التوصل إلى إتفاق خلال مدة ( ٣٠ يوم) من تاريخ نشوء النزاع يتم اللجوء الى القضاء العراقي وتكون محاكم البصرة هي المختصة بالنظر في النزاعات الناشئة عن هذا العقد وان القانون العراقي هو القانون الواجب التطبيق .

شركة طاقة الخليج للخدمات النفطية TAQA ... ENERGY

**البند العاشر / التحميل :-**

١- لا يعتبر الطرف الأول مسؤولا عن اي مطالبه او إعتراض على الكمية او النوعية لمادة زيت الوقود المحملة من المصفى على الصهاريج إذا حدثت هذه المطالبة او الاعتراض بعد التحميل على الصهاريج والتوقيع على مستندات الشحن .

٢- يكون النقل البحري بواسطة ناقلات الطرف الأول ( شركة ناقلات النفط العراقية ) وفي حالة تعذر قيام الطرف الأول بالنقل بواسطة ناقلاتها لاي سبب كان يدفع الى الطرف الثاني مبلغ وقدره ( ٢٠ ) دولار / طن عشرون دولار كاجور نقل بحري على ان يتحمل كافة الرسوم والعوائد والأجور المترتبة على إرساء وتحميل وإبحار الناقلة .

٣- يلتزم الطرف الثاني بتوفير ناقلات مسجلة دولياً ومستوفيه لشروط ( IMO ) ونادي ( P&I ) ومقبولة من قبل الشركة العامة للموانئ العراقية المختصة .

٤- على الطرف الثاني توفير خزان عائم أذا كان ضروريا على أرصفة ميناء خور الزبير او اي رصيف اخر يتم تهيئته من قبل الطرف الثاني لغرض تخزين حمولات السيارات الحوضية ( الصهاريج ) شرط ان تتوفر فيه كافة شروط السلامة ومقبول من قبل الموانئ العراقية .

٥- على الطرف الثاني ان يهيئ رصيف متكامل متوفر فيه كافة المواصفات الفنية للتحميل والتفريغ .

٦- يلتزم الطرف الثاني بتعيين مندوبين دائمين في موقع التحميل في المصفى للإشراف على عملية التحميل ومراقبة الكمية والنوعية والتوقيع على مستندات التحميل وتعتبر مستندات التحميل الموقعة من قبل المندوبين ملزمه لأغراض إتمام إجراءات الدفع والتسليم ومندوبين في موقع التفريغ ( تفريغ السيارات الى الناقلة ) تقوم بالتنسيق مع الجهة المسؤوله عن الرصيف لتوفير منظومة التفريغ من مضخات وخراطيم ومعدات السلامة ..الخ وكذلك توفير مكاتب لمندوبي شركتنا في مواقع التحميل والتفريغ لغرض المتابعه والتنسيق مع الجهات ذات العلاقة .

٧- يتعهد الطرف الأول بتسهيل مهمة الطرف الثاني فيما يخص إجراءات التحميل ، تعيين مندوب ...الخ .

٨- يكون الطرف الثاني مسئولا عن المخالفات التي تحصل من سائقي السيارات الحوضية المستخدمين من قبله خلال فترة قيامهم بنقل المنتوج ويتحمل كافة التبعات القانونية والمالية الناتجة عن هذه المخالفات ومن ضمنها مسؤوليته عن إي ضرر او فقدان نتيجة الإهمال او عدم الامتثال للقانون او مراعاة للأنظمة النافذة داخل الموقع وفي العراق من قبل مندوبيه والأشخاص الذين يعملون لديه .

٩- يجب ان تكون السيارات الحوضية ( الصهاريج ) مسجلة باسم الطرف الثاني او متعاقدة معه رسميا وتكون السيارات المحملة في المصفى هي نفسها المفرغة في الميناء ولا يجوز بأي حال من الأحوال مناقلة الحمولة من سيارة الى أخرى.

١٠- يكون حساب حمولة السيارات الحوضية ( الصهاريج ) على اساس وزن الشاحنة وهي فارغة ثم وزنها وهي محملة على الميزان الجسري للمصفى وتعتبر هي الكمية المعتمدة من جميع الاطراف .

١١- يلتزم الطرف الثاني بالقوانين العراقية المتعلقة باتخاذ الإجراءات اللازمة لمنع التلوث بالمنتجات النفطية والحفاظ على البيئة ويتحمل المسؤولية و كافة المصاريف الناجمة عن التلوث داخل الأراضي العراقية وفي حالة ظهور ضرر بيئي يستوجب التغريم باستقطاع من مبالغ الشحنات المودعه وحسب تقدير اللجان المختصة بالتلوث .

١٢- يتعهد الطرف الثاني بتحمله المسؤولية الكاملة عن تبعات عدم التنفيذ لعدم تمكنه من أيجاد منفذ للتصدير او عدم توفير سيارات حوضية كافية لتحميل كامل الكمية اليومية المقررة من قبل مصفى الدورة وبخلافه يحق للطرف الأول مصادرة كفالة حسن التنفيذ وعدم تحمله ( الطرف الأول ) أي مسؤولية قانونية او ماليه من جراء عدم توفير منفذ للتصدير ( رصيف متاح ) .

١٣-يكون الطرف الثاني مسؤول حصريا عن سلامة وامن الصهاريج على أن يقوم بتحديد مسؤول امني يقع على عاتقة ضمان وسلامة وامن وتفتيش كافة الصهاريج .

**البند الحادي عشر / فسخ العقد او إنهاؤه :**

١- يحق للطرف الأول في حالة إخلال الطرف الثاني بأي بند او شرط من شروط هذا العقد دون الحاجة لتوجيه انذاراو حكم قضائي ودون ان يترتب عليه اي مسؤولية او التزام التنفيذ على حسابه ومصادرة التامينات النهائية وتحميله فرق البدلين دون الحاجة للجوء للمحاكم المختصة .

٢- مع مراعاة او دون مراعاة الفقرة (١) يحق للطرف الاول فسخ العقد في حالة اخلال الطرف الثاني ببنود العقد دون الحاجة للجوء للمحاكم .

٣- مع مراعاة او دون مراعاة الفقرة (٢) يتم حسم المنازعات بين طرفي العقد كما ورد ذكره في البند التاسع اعلاه .

٤- في حالة صدور حكم قضائي بات يتعلق بالقضايا الأمنية التي تمس امن البلد ضد الطرف الثاني إثناء سريان هذا العقد يتم فسخ العقد ومصادرة التأمينات وتتخذ بحقه الإجراءات القانونية وعدم التعامل معه مستقبلا .

٥- يحق للطرفين بالاتفاق انهاء العقد دون الحاجة لتوجيه انذاراو حكم قضائي ودون ان تترتب اي مسؤولية او التزام .

**البند الثاني عشر / الأحكام العامة**

١. لا يحق للطرف الثاني الاعتراض على كميات ومواصفات المنتوج بعد تحميله من المصافي المذكورة في العقد والتوقيع على مستندات التحميل وتكون الحمولة بعهدة الطرف الثاني لحين وصولها الى ميناء التفريغ .

٢. يتعهد الطرف الثاني بتسمية ممثله المخول لمتابعة كافة الأمور العقدية والمالية والشحن بموجب وكالة رسمية مصدقة من قبل كاتب العدل عند التعاقد وصادرة قبل توقيع العقد وتستمر نفاذيتها طيلة فترة العقد .

٣. يتعهد الطرف الثاني بعدم القيام بأي أعمال تهريب او تزوير مستندات او استخدام وثائق مزورة او محاولة إفساد ذمم ذوي العلاقة لانجاز أعماله أو القيام بأية نشاطات غير مشروعة ويتحمل كافة التبعات القانونية والمالية الناجمة جراء ذلك .

٤ - تعتمد حسابات الاستلام الشحنة على مستندات تحميل الصهاريج الصادرة من مصفى الدورة وتكون الحمولة بعهدة الناقل لحين إيصالها ميناء التفريغ .

٥ - للطرف الأول الحق بالإشراف على عملية الشحن والتفريغ للخزان العائم ان وجد.

٦- يتحمل الطرف الثاني تحميلات إدارية بنسبه لا تزيد على ٢٠% من الكلف الفعلية في حال قيام الطرف الأول بتقديم هذه الخدمات .

٧- لا يحق للطرف الثاني التنازل كلا او جزءً عن الحقوق والالتزامات التعاقدية الواردة في هذا العقد الى طرف ثالث دون استحصال الموافقة الخطية المسبقة من الطرف الأول وبخلافه يحق للطرف الأول إلغاء العقد ومصادرة كفالة حسن التنفيذ بالكامل ولا يحق للطرف الثاني التظلم امام القضاء .

٨- يكون هذا العقد خاضعا لتعليمات تنفيذ العقود الحكومية رقم (٢) لسنة ٢٠١٤ وكافة التشريعات العراقية النافذة وللإحكام والضوابط والأنظمة الضريبية المعمول بها حسب القوانين النافذة مالم يرد على احكامها استثناء من الجهات ذات الصلاحية .

٩- تستحصل الديون المترتبة بذمة الطرف الثاني من جراء تنفيذ هذا العقد بموجب قانون تحصيل الديون الحكومية رقم ٥٦ لسنة ١٩٧٧ المعدل .

١٠- يلتزم الطرف الثاني بالتأمين على العقد بموجب وصل القبض ذي العدد ف١٠/نقل/٢٠١٦/١/٢ المؤرخ في ٢٠١٦/٢/١٠

١١- لا يتحمل الطرف الأول اي مصاريف او أجور تتعلق بالتأمين.

١٢- للطرف الأول إصدار ملحق للعقد في حال تعديل بنوده او إحكامه متضمن المتغيرات التي تحدث على احكامه وفي كافة العقود مع ضرورة مراعاة السياقات المعتمدة بهذا الشأن .

شركة طاقة الخليج للخدمات النفطية
TAQA = GULF ENERGY

١٣- يعتبر عنوان الطرف الثاني والبريد الالكتروني وارقام الهواتف المثبته في العقد هو العنوان الذي يتم عن طريقه اجراء التبليغات والاندارات والمخاطبات والمراسلات بالامور المتعلقة بهذا العقد ويوثق ذلك في الكتب الرسمية والرسائل الالكترونية المعتمدة وفي حالة تغيير العنوان من قبل الطرف الثاني فعليه تبليغ الطرف الاول بالتغيير الحاصل بالعنوان ويوثق ذلك في الكتب الرسمية والرسائل الالكترونية المعتمدة .

١٤- يلتزم الطرف الثاني بتقديم تعهد الى قيادة قوات شرطة الطاقة (غرفة عمليات النفط والطاقة ) يتضمن سلامة موقف سائقي الشاحنات التابعين لهم من النواحي الامنية وغير موقوفين او محكومين او مطلوبين للقضاء وللاجهزة الامنية لقضايا ارهابية من شأنها تسبيب خطورة في عملهم للمصلحة العامة وبخلافه يتحمل الطرف الثاني كافة التبعات القانونية مع تزويدنا بنسخة من التعهد .

١٥- يلتزم الطرف الثاني بمراجعة دائرة التقاعد والضمان الاجتماعي وتزويدنا ببراءة الذمة .

١٦- يلتزم الطرف الثاني بجميع القوانين او التشريعات او القواعد او التعليمات العراقية الخاصة بالبيئة والسلامة والصحة المهنية .

١٧- ان تكون جميع السيارات المستخدمة من النوع المحكم والذي لا ينتج عنه اي تسريب او غازات طالما كانت السيارة متوقفة او متحركة .

١٨- يلتزم الطرف الثاني بعدم التعامل مع أسرائيل بأي شكل من الإشكال وبخلافه يتحمل كافة التبعات القانونية والمالية .

١٩- الالتزام بسياسة الشركة تجاه السلامة والصحة والبيئة الالتزام والتوقيع على الوثائق المرفقة طيا .

٢٠- يتحمل الطرف الثاني المسؤولية القانونية كاملة اذا تبين عدم صحة الأوراق والمستمسكات والمعلومات المقدمة للطرف الأول .

الطرف الأول
المدير العام لشركة ناقلات النفط العراقية
إضافة لوظيفته
حسين علاوي عبد علي

الطرف الثاني
المدير المفوض لشركة طاقة الخليج
للخدمات النفطية /محدودة المسؤولية
إضافة لوظيفته

| | |
|---|---|
| **From:** | Ian Thompson <it@amiraindustries.ch> |
| **Sent:** | 09 April 2016 11:11 |
| **To:** | ROLNIK Doron |
| **Cc:** | Lawrence Kayablian; Arman Kayablian; MEREI Hanna |
| **Subject:** | Fwd: IOTC/GEPC Contract Translation - Draft |
| **Attachments:** | IOTC - Geps Contract translation (final)- Transportation of bunker fuel oil 090416.docx; ATT00001.htm |

Dear Doron

Good Morning

As promised please find attached the final translation copy of the IOTC/GEPS contract

Have a good weekend and speak Monday

Warmest Regards

Ian

Mobile +44 7552 277527

Sent from my iPhone

1

**Nº.: 4**
**Date: February 15, 2016**

### Ref/ Contract of Sale and Transportation of Quantities of Fuel Oil (Bunker) from Dora Refinery

First Party: General Manager of Iraqi Oil Tankers Company/ in addition to his position
Full address: Iraq – Basrah
Tel: (00 964) 311115 – 313348
E-mail : iotc-basrah@yahoo.com
Second Party: Gulf Energy for Petroleum Services / Limited Liability
Full address: Baghdad / Karradah, locality nº. 901, building nº. 27, street nº. 42.
E-mail : info@gulf-energy.me
Tel: 07901174931 / 07715447428

The parties agreed upon the following:

### Clause 1: Object of Contract:
Sale of the quantities dedicated to the Iraqi Oil Tankers Company of fuel oil (bunker) reaching 60000 – 120000 (sixty thousand to one hundred and twenty thousand) tons / month. The said quantities being subject to increase and reduction, according to quantities available in the refinery, and are loaded from Dora refinery and reach the ports of the Arab Gulf.

### Clause 2: Contractual Term:
1- The contractual term shall be for one year extendable and renewable upon the agreement of the two parties. The said term shall be enforced as of the date of work initiation provided that work initiation does not exceed (15) from the date of contract signature by the first party.
2- Periods of stopping of loading due to the refinery, emergency situations or force majeure, shall be added to the contractual term.

### Clause 3: Specifications
1- The specifications of bunker fuel oil loaded from the abovementioned refinery shall be as follows:

| Item | Test | Result | Specifications |
|------|------|--------|----------------|
| 1 | Density @ 15.0 C° g / cm3 | 0.98 | Max |
| 2 | Sulfur content wt % | 5 | Max |
| 3 | Flash point C° (P.m) | 100 | Max |
| 4 | Viscosity @ 50 C° (CST) | 500 | Max |
| 5 | Pour point (C°) | +9 | Max |
| 6 | Carbon residue (wt %) | 9.5 | Max |

2- The quantities fixed by the refinery (by metric tons) shall be adopted on the shipping documents of tank cars or fixed in the daily official stance for loading issued by the refinery when conducting calculations between the two parties. The second party shall not be entitled to object on the same following loading and signature of the shipping documents.

## Clause 4: Payment Mechanism

a- In the event of payment in cash: the second party shall commit to pay the value of the monthly loaded quantity in cash prior to the start of loading and based on the estimated price, provided that such value shall be strengthened, and the amount shall be deposited in our Company's account at the Trade Bank of Iraq / Basrah / dollar, and then the accounts shall be settled monthly while the second party bears all banking commissions, provided that the absolute quantities of loading shall be in the form of payments (proportionally to the loading capacity of the refinery) in a way not exceeding the maximum fixed in the contract and in accordance with the amounts deposited by the above company.

b- The second party shall bear the following:
1- The fees of land transportation using cisterns.
2- All banking commissions.
3- The fees of vehicles entering to the dock and the rental of the unloading dock.
4- The customs fees and difference between the loaded and discharged quantities, if any.
5- The fees of maritime agencies.
6- All fees, wages and revenues due for the landing, loading and sailing of the tanker.
7- Fees of stamp and the publication of the declaration prior to contract signature.
8- Any other fees from the authorities concerned.

## Clause 5: Sale Price:

1- The price of sale reaching the ports of the Arab Gulf shall be in accordance with the following equation:

$$\text{Sale Price} = \frac{\text{Monthly rate of the Platts World Circular CST } 180 + \text{monthly rate of BunkerWire circular CST } 180 \text{ (Al Fujairah)}}{2}$$

2- The sum of (35.75) dollar / ton (thirty-five dollars and seventy-five cents per ton) shall be deducted from the sale price. It represents the fees of land transportation and all fees stipulated in clause 4 / b, and the sum of (20) dollars / ton (twenty dollars per ton) shall be also deducted from the same. It represents the fees of maritime transportation in case of inability to transport through our company's tankers.

3- Maritime transportation shall be conducted using our Company's tankers, and if it is not possible, the second party shall conduct maritime transportation in exchange for 20 dollars / ton as fees for the transportation of one ton, such sum shall be deducted from the final sale price and our Company shall be entitled to choose between transportation using its own tankers or using the tankers provided by the second party. The second party shall bear all the expenses due on the tanker if transportation was carried out by them.

4- The second party shall carry out land transportation using tank cars (cisterns) from Dora refinery to the tanker docked at the docks of Khor Al Zubair Port or any other loading dock prepared by the same. The said party shall bear all the fees and wages due on such process, provided that all such vehicles shall meet the technical and official conditions. The second party should submit lists of such vehicles and the names of drivers and their assistants, if any, to be adopted by us and by the refinery.

5- A difference of one dollar per ton for every decimal shall be granted to the second party to treat the neutralization taking place in the sulfur content of the fuel oil, for what exceeds 3.50% in weight, in accordance with the following equation:

$(0.1691 + x)\ 0.02894$ = amount of difference in the result of the test between two laboratories ((whereas (x) represents the percentage of actual sulfur content in the product))

6- A difference shall be granted to the second party for the neutralization in the degree of viscosity above CST 180, in accordance with the following equation:

$$\frac{\text{Average weekly price of fuel oil CST 180} - \text{weekly average of fuel oil CST 380}}{200} = \text{difference in price}$$

Value of the difference in the test between the two laboratories = Actual viscosity x 0.074
Average weekly price of fuel oil CST 180 – difference in price = New decided weekly price for viscosity exceeding CST 180.

7- A difference shall be granted to the purchaser for the flash point in accordance with the following equation falling below 60 degrees:

Difference in the flash point from 60 degrees x 0.4% x total value of shipment (dollar)

8- The final sale price shall be determined in accordance with the following:
The sale price referred to in paragraph 1 minus (55.75 + differences in technical specifications mentioned in paragraphs 5, 6 and 7).

## Clause 6: Penalties of delay:
The second party shall bear a penalty of delay for days of delay in executing its contractual obligations in accordance with the following equation:

$$\frac{\text{Original contract amount} + - \text{any change in the amount (changes that accompany the increase or decrease in global prices)}}{\text{Total contract term (original contract term} + - \text{any}} \times (25\%) = \text{penalty of delay for one day}$$

change in the term)

## Clause 7: Performance bond and insurances

1- The second party shall deposit in the first party's account the sum of 5% of the total contract amount in the form of a performance bond letter one year prior to contract signature.

2- The performance bond shall be completely confiscated if the loading rate is below 25%.

3- The first party shall be entitled to deduct penalties and sums due by the second party from the performance bond provided that what was deducted from the amount of the guarantee shall be settled during contract execution upon being notified by the first party.

4- The first party shall be entitled at any time during the contract validity period to decrease or increase quantities without incurring any liability or obligation as a result. The first party shall be entitled to change the loading locations according to the need and work conditions.

5- The second party shall not be entitled to claim the confiscated amounts or file a lawsuit in such concern.

6- Should the second party breach in the execution of the contract terms, the performance bond shall be confiscated while bearing the two differences as a result of their breach of their commitments following the start of contract execution and sale for a price lower than the assumed price as a result of a delay in the execution of the contract terms which led as a result to the delay of the sale operation.

7- In the event that the second party granted an additional quantity or increase in prices for the Platts circular rate, such quantity shall be covered using a performance bond reaching 5% of the estimated value of the additional quantity.

8- In any event whatsoever, the contract shall only be liquidated and the remaining sums of deposits or the performance bond shall only be returned following the issuance of a letter from the General Tax Authority confirming the discharge of the second party and the release of dues within 30 days from the date of being notified by the first party, otherwise, the instructions of mutual agreement on tax settlement shall be applied in accordance with the Iraqi laws in force concluded between the Iraqi and foreign contractual parties, and any other instructions issued in this concern and following obtaining the discharge from the Department of Retirement and Social Security.

9- The first party shall not bear liability for the period of time spent by the General Tax Authority in completing its required procedures to provide the second party with discharge. The second party should commit to extending the period of the letter of guarantee.

## Clause 8: Force Majeure

1- The contractual parties shall be exempted from the responsibility of failure / shortage in the prepared quantities / delay, if it is due to force majeure based on the regulations and provisions of the Iraqi law.

2- In the event that the period of delay due to force majeure exceeded three months, any of the parties hereto shall be entitled to terminate the contract after advising the other party in writing.

### Clause 9: Settlement of Disputes:

Conflicts and disputes which may occur as a result of the execution of the present contract shall be settled amicably through negotiation between the representatives of the two contractual parties. In the event of not reaching an agreement within 30 days from the date of occurrence of such dispute, there shall be recourse to the Iraqi justice system and the courts of Basrah shall be competent to settle the disputes arising from the present contract and the Iraqi law shall be the applicable law.

### Clause 10: Loading:

1- The first party shall not be deemed liable for any claim or objection on quantity or quality of fuel oil loaded from the refinery in cisterns in the event that such claim or objection occurred following loading on cisterns and signature of the shipping documents.

2- Maritime transportation shall be conducted using the first party's tankers (Iraqi Oil Tankers Company) and in the event that the first party failed to conduct transportation using its tankers for any reason whatsoever, the same shall pay to the second party the sum of 20 dollars / ton (twenty dollars) as fees for maritime transportation, provided that the same shall bear all the expenses, revenues and fees due for the docking, loading and sailing of the tanker.

3- The second party shall undertake to provide internationally registered tankers meeting conditions of IMO and P&I Club and acceptable by the competent General Company for Iraqi Ports.

4- The second party should provide a floating tank if necessary on the docks of Khor Al Zubair Port or any other loading dock prepared by the second party for the purpose of storing the loads of tank cars (cisterns) under the condition of meeting all safety conditions and being accepted by Iraqi ports.

5- The second party shall prepare an integrated dock meeting all technical specifications of loading and unloading.

6- The second party shall commit to appointing two permanent delegates in the loading location at the refinery to supervise the process of loading, monitor the quantity and quality and sign the loading documents. The loading documents signed by the two delegates shall be deemed binding for the purposes of completing the procedures of payment and delivery. The same shall also commit to appointing two delegates at the unloading location (unload the vehicles to the tanker) to coordinate with the authority in charge of the dock to provide the unloading system such as pumps, hoses and safety equipment, etc... in addition to providing offices for our Company's delegates at the loading and unloading locations for the purpose of follow-up and coordination with authorities concerned.

7- The first party shall undertake to facilitate the second party's task concerning loading procedures, appointment of a delegate, etc…

8- The second party shall be in charge of violations by drivers of tank cars employed by the same during their transportation of the product. The same shall bear all legal and financial consequences resulting from such violations, including its responsibility for any damage or loss as a result of neglect or non-abidance by the law or compliance with the regulations in force inside the location and in Iraq by its delegates and employees.

9- Tank cars (cisterns) should be registered under the name of the second party or should have signed an official contract with the same. The vehicles loaded in the refinery shall be the same vehicles unloaded in the port and the load may not be transferred from one vehicle to another under any circumstance.

10- The calculation of the load of tank cars (cisterns) should be made on the basis of the empty weight of the truck then its weight when loaded on the bridge balance of the refinery and the said quantity shall be deemed adopted by all parties.

11- The second party shall abide by the Iraqi laws related to taking the necessary procedures to prevent contamination with petroleum products and preservation of the environment. The same shall bear liability and all expenses resulting from contamination inside the Iraqi territories. In the event of occurrence of an environmental damage, fines should be imposed by deducting from the sums of loaded shipments and according to the assessment of committees in charge of contamination.

12- The second party shall bear full liability for the consequences of non-execution for not being able to find an exportation outlet or not providing sufficient tank cars to load the entire daily quantity decided by Dora Refinery, otherwise the first party shall be entitled to confiscate the performance bond and the first party shall not bear any legal or financial liability as a result of not providing an exportation outlet (available dock).

13- The second party shall be exclusively responsible for the safety and security of cisterns, provided that the same shall appoint a security official who shall be in charge of guaranteeing the safety, security and inspection of all cisterns.

## Clause 11: Contract Termination or Expiry:

1- In the event of the second party's breach of any clause or condition in the present contract, and without the need to serve a warning or judicial verdict and without incurring any liability or commitment, the first party shall be entitled to execute on its expense, confiscate the final guarantees and charge the second party with the difference of both fees without having recourse to competent tribunals.

2- Subject or not subject to paragraph 1, the first party shall be entitled to terminate the contract in the event of the second party's breach of the contract terms without the need to have recourse to tribunals.

3- Subject or not subject to paragraph 2, disputes between the parties hereto shall be settled as stipulated in clause 9 hereinabove.

4- In the event that a judicial verdict was rendered concerning security issues affecting the security of the country against the second party during the validity of the present contract, the contract shall be terminated, guarantees shall be confiscated and legal procedures

shall be taken against the second party and there shall be no collaboration with the same in the future.

5- The parties hereto shall be entitled to terminate the contract by agreement without the need to serve a warning or judicial verdict and without incurring any liability or commitment.

## Clause 12: General Provisions:

1. The second party shall not be entitled to object on the product's quantities and specifications following the loading thereof from the refineries mentioned in the contract and signature of the loading documents. The load shall be in the custody of the second party until reaching the port of discharge.
2. The second party shall undertake to appoint its authorized representative to follow-up on all contractual and financial matters and ship as per an official power of attorney certified by the notary public upon signing the contract and issued prior to contract signature with validity lasting throughout the contract term.
3. The second party shall undertake not to conduct any works of smuggling or forgery of documents, use of forged documents, attempting to corrupt the receivables of stakeholders to conduct the business thereof or carry out any illicit activities. The said party shall bear all the resulting legal and financial consequences.
4. The calculations of the receipt of the shipment shall rely on the documents of loading of cisterns issued by Dora refinery. The load shall be in the custody of the carrier until their delivery to the port of discharge.
5. The first party shall be entitled to supervise the process of shipment and discharge of the floating cistern, if any.
6. The second party shall bear administrative charges of no more than 20% of the actual costs in the event that the first party provided such services.
7. The second party shall not be entitled to assign all or part of the rights and contractual commitments stipulated in the present contract to a third party without obtaining the prior written approval of the first party, otherwise the latter shall be entitled to cancel the contract and confiscate the performance bond entirely and the second party shall not be entitled to appeal before justice.
8. The present contract shall be subject to the instructions of execution of Governmental contracts n°. (2) for 2014, and all the Iraqi legislations in force and the applicable regulations, controls and tax systems in accordance with the laws in force unless there is an exception to the provisions thereof from competent authorities.
9. Debts due by the second party as a result of the execution of the present contract shall be collected as per the law on collection of governmental debts n°. 56 for 1977, amended.
10. The second party shall undertake to ensure the contract as per collection receipt n°. F10/Transportation/2016/1 dated on February 10, 2016.
11. The first party shall bear no expenses or fees related to insurance.

12. The first party shall be entitled to issue an appendix for the contract in the event of amendment of the terms or provisions thereof inclusive of the changes occurring on the provisions thereof and in all contracts with the necessity of observing the adopted contexts in this concern.

13. The second party's address, e-mail and telephone numbers fixed in the contract as the address by which the notifications, warnings, letters and correspondences on the matters related to the present contract are made. This shall be documented in the adopted official letters and e-mails and in the event of change in the address by the second party, the latter should notify the first party of the change occurring on the address and the same shall be documented in the adopted official letters and e-mails.

14. The second party shall commit itself to present an undertaking to the Command Of The Energy Police Forces (oil and energy operations room) which includes the safety of the stance of truck drivers affiliated to them and that the same are not arrested, sentenced or wanted by justice and security services for terrorist issues which could lead to danger in their work for the public interest, otherwise the second party shall bear all the legal consequences while providing us with a copy of the undertaking.

15. The second party shall commit itself to have recourse to the Department of Retirement and Social Security and provide us with a discharge.

16. The second party shall be bound by all the Iraqi laws, legislations, regulations or instructions pertaining to the environment, professional safety and health.

17. All the vehicles in use shall be of the secure type, not resulting in any leak or gases whether the vehicle is stopped or moving.

18. The second party shall undertake not to deal with Israel in any way whatsoever; otherwise the same shall bear all the legal and financial consequences.

19. To commit to the Company's policy towards safety, health and the environment and to commit to and sign all the documents enclosed herewith.

20. The second party shall bear full legal liability in the event that the validity of the papers, documents and information submitted to the first party is not proven.

| | |
|---|---|
| First Party | Second Party |
| General Manager of Iraqi Oil Tankers Company | Managing Director of Gulf Energy for Petroleum |
| In addition to his position | Services / Limited Liability |
| Hussain Allawi Abd Ali | In addition to his position |
| General Manager by proxy | (Signature and seal) |
| (Signature and seal) | |

Legal Department

Certification

Based on the authority granted to us as per the law of notaries public no. 33 for 1998, amended, we hereby authenticate the validity of the above signatures

Legal Department

(Signature and seal)

**END OF TRANSLATION**

**From:** Arman Kayablian [mailto:ak@amiraindustries.ch]
**Sent:** mardi 12 avril 2016 13:38
**To:** MEREI Hanna; Ian Thompson; Lawrence Kayablian
**Cc:** ROLNIK Doron
**Subject:** Re: Payment confirmation

Dear All,

For compliance purposes, and since we do not have the contract signed, or the advance agreement signed. Could we have letter from you stating that the funds sent are prepayment for the April loading of Fuel Oil. If you could provide this, that would be great.

Regards,


Arman Kayablian
Chief Operating Officer



Amira Industries
In care of Amira Management
Marfaa' 127 Bldg - Foch Street
Postal Code 2012 6607
Downtown Beirut
Lebanon
T +961 1 985 308
F +961 1 985 309
M +1 571 278 3630 (US)
M +961 76 60 06 76 (Lebanese)

This e-mail and any attachments are strictly confidential and may be legally privileged. If you are not the intended recipient, please inform the sender immediately; do not copy or use this e-mail and any attachments, use their contents or disclose their contents to any unauthorized third party. Please note that e-mails are susceptible to change. Amira reserves shall not be liable for the improper or incomplete transmission of the information contained in this communication nor for any delay in its receipt or damage to your system. Amira Industries does not guarantee that the integrity of this communication has been maintained nor that this communication is free of viruses, interceptions or interference.

**From:** MEREI Hanna <Hanna.MEREI@gunvorgroup.com>
**Date:** Tuesday, April 12, 2016 at 11:02 AM
**To:** Ian Thompson <it@amiraindustries.ch>, Lawrence Kayablian <lk@amiraindustries.ch>, Arman Kayablian <ak@amiraindustries.ch>
**Cc:** MEREI Hanna <Hanna.MEREI@gunvorgroup.com>, ROLNIK Doron <Doron.ROLNIK@gunvorgroup.com>
**Subject:** FW: Payment confirmation

**Pls see below swift as received from ING:**
qte
T$ FROM : BBRUCHGTXXX
ING BELGIUM, BRUSSELS, GENEVA BRANC
::
GENEVA SWITZERLAND

TO : CHASUS33XXX

JPMORGAN CHASE BANK, N.A.
NEW YORK,NY UNITED STATES


DATE : 11/04/2016 17:46


MT103 : Single Customer Credit Transfer
(20 ) Sender's Reference TRF/103102409

(23B) Bank Operation Code CRED - No SWIFT Service Level involved

(32A) Value Date Currency Interbank Settled Amount
Date 11.Apr,16
Amount USD 3,000,000.00

(33B) Currency Instructed Amount USD 3,000,000.00

(50K) Ordering Customer
Account CH6508387000001070630
Name Address GUNVOR SA
RUE DU RHONE 80-84
GENEVA
SWITZERLAND

(57A) Account With Institution
Identifier Code INLELBBEXXX
IBL BANK S.A.L.
(FORMERLY INTERCONTI
BEIRUT LEBANON

(59 ) Beneficiary Customer
Account LB13005200070023010705932012
Name Address Nemsss Petroleum Ltd

(70 ) Remittance Information Invoice PF16040001

(71A) Details of Charges OUR
CREATION IMPORT 11/04/2016 17:43:12 IMPING ROUTE-AS400 0
CREATED
**From:** ARMINJON, Vincent
**Sent:** lundi 11 avril 2016 18:07
**To:** 'MEREI Hanna (hanna.merei@gunvortrade.ch)'
**Cc:** 'WAND Lars-Erik (lars-erik.wand@gunvortrade.ch)'
**Subject:** Payment confirmation
Dear Hanna
Hereby confirm that USD 3 000 000 payment to Nemsss Petroleum Ltd has been properly made on 11.04.2016 – swift copy to
follow tomorrow morning
BR
Vincent
ING ℳ
Vincent Arminjon
Senior Transaction Manager - Oil Desk
Wholesale Banking, Trade & Commodity Finance
ING Belgium, Brussels, Geneva Branch
6, Rue Jean Petitot
CH-1204 Geneva
☎ +41 22 592 2228
· +41 22 592 3003
mailto:vincent.arminjon@ing.ch
_____DISCLAIMER_____

This message is intended only for use by the person(s) to whom it is addressed. If you are not the intended recipient of this message, kindly notify the sender immediately and destroy this message. Thank you.

There are risks in communicating by e-mail, such as data corruption, delay, interception and unauthorized amendment, none for which we accept liability. Anyone who communicates with us by e-mail assumes such risks.

---

Please note that as of 9 April 2016, Gunvor Group has updated its corporate email to the GunvorGroup.com domain. To ensure you continue to receive correspondence from our company, please update your address book to reflect this change.